## 19522

BOWATERS CAROLINA CORPORATION, Respondent, v. CAROLINA PIPELINE COMPANY, Appellant.

(193 S. E. (2d) 129)

502

*Messrs. Gressette & Gressette,* of St. Matthews, *John M. Spratt,* of York, *Harry M. Lightsey, Jr.,* and *Watts B. Stroman,* of Columbia, *for Appellant,* 

*O. G. Calhoun, Esq.,* of *Haynsworth, Perry, Bryant, Marion & Johnstone,* Greenville, *for Respondent,* 

*Messrs. Gressette & Gressette,* of St. Matthews, *John M. Spratt,* of York, *Harry M. Lightsey, Jr., and Watts B. Stroman,* of Columbia, *for Appellant, in Reply.*

November 21, 1972.

*Per Curiam:*

The decree of the circuit court, here appealed from, will be reported herewith, with the deletion, however, of some matters not presently material. It is conceded that all issues are legal ones and that findings of fact by the court below are binding upon this Court if supported by competent evidence. Review of the evidence convinces us that all material findings of fact by the trial judge are abundantly supported by competent evidence. We are convinced that the circuit decree properly disposed of all issues in the case and said decree, as hereinafter construed, will be affirmed.

Appellant argues, *inter alia,* that the decree granted relief to the respondent beyond that which is sought. There is no merit in this contention which is based upon the fact that witnesses for the respondent conceded that in the curtailment and restoration of service it was not entitled to preference over "distribution interruptible customers". The decree clearly recognized that respondent was not entitled to a preference over "human needs customers". This latter term is fully defined in the contract between the parties and reference thereto, and other exhibits in the case, clearly shows that the term "distribution interruptible customers", as intended and used by the witnesses, is embraced within the meaning of the phrase "human needs customers", as defined in the contract. Hence, the decree does not accord respondent a preference over "distribution interruptible customers", as contended by appellant.

Appellant also appeals from the order of the lower court settling the case on appeal. Involved are the following facts. The issues in the case were joined by complaint dated June 24, 1970, and an amended answer dated December 3, 1970. The complaint alleged and the

answer admitted that as a result of the dispute about the contract involved in this case, on April 1, 1970, appellant began supplying respondent with gas under an interim agreement of the parties under which, however, all rights of the respondent under the original contract were fully reserved. One prayer of the complaint was that the appellant be required to rebate to the respondent all sums collected by the appellant under the aforesaid interim agreement, or such other interim agreement that might be entered into, in excess of the sums required to be paid under the original contract, together with interest thereon until date of payment. The answer of the appellant prayed that it be declared entitled to all sums held in escrow under the interim agreement of April 1, 1970, but made no other mention thereof, or of any other interim agreement.

Between the date of the complaint and the date of the answer, it now appears that two other interim agreements were entered into by and between the parties, but neither is anywhere mentioned in the pleadings. The appellant sought to have all three of these interim agreements included as a part of the case on appeal, such, however, being disallowed in the order settling the case.

The order pointed out that these interim agreements, except for the first one, were not even mentioned in the pleadings; were not introduced into evidence or mentioned in the argument to the court; were not, consequently, before the court and of course not considered in the preparation of the decree appealed from. We are satisfied that there was no error on the part of the trial judge in excluding these agreements. With a single relatively minor exception, hereinafter noted, appellant does not demonstrate wherein these agreements would have been pertinent or germane to any issue presented to the lower court, either in the pleadings or thereafter, even had they been offered in evidence.

Appellant asserts that under the interim agreement of April 1, 1970, it was provided that any refunds of excess

payments which might be required would not bear interest. Even though this point was not raised below, counsel for respondent, in oral argument, conceded that the judgment should be construed as awarding interest only from the date of the judgment, to which respondent would be entitled as a matter of law in any event. In the light of such concession, the point, of course, need not be further pursued.

We are convinced that all exceptions of the appellant are without merit and the judgment below, as herein construed, is accordingly,

Affirmed.

Moss, C. J., and Lewis, Bussey, Brailsford and Littlejohn, JJ., concur.

## ORDER OF JUDGE SPRUILL

The above-entitled action is one brought by the plaintiff seeking a declaratory judgment to determine its right under a contract for the purchase of natural gas. This contract was executed October 4, 1957, and was to run for twenty years from the date that Bowaters made its first shipment of sulphate pulp from its Catawba plant in York County, which shipment was subsequently made in July, 1959. The plaintiff's action was brought in June 1970, and the defendant thereafter answered. The matter came before the undersigned by agreement of counsel when he was holding court at York in December, 1970. At that time, the parties agreed that it would be necessary to take testimony and this was done on January 20, 1971. The plaintiff is represented by Mr. O. G. Calhoun of Haynsworth, Perry, Bryant, Marion & Johnstone, and the defendant is represented by Mr. John M. Spratt, Mr. Watts B. Stroman and Mr. Harry M. Lightsey, Jr., of Berry, Lightsey, Gibbes and Bowers.

At the time of the January hearing it was agreed that counsel would prepare written briefs with the first to be filed by Mr. Calhoun for the plaintiff. It was further agreed that the briefs were not to be filed until the testimony had been

transcribed and made available to counsel. On April 1—Mr. Calhoun asked leave to open the case to introduce certain exhibits. The defendant objected and a hearing was held in June on the question of the receipt of the additional exhibits desired by the plaintiff. The writer ruled that the court would not accept the exhibits and, thereafter, on July 23rd, Mr. Calhoun mailed the court a copy of his Brief in which he objected to many of the exhibits tendered by the defendant at the January hearing and in which he argued the plaintiff's case for declaratory judgment. Thereafter, Mr. Lightsey mailed the defendant's Brief to the court on August 8. Subsequently, on August 13, Mr. Calhoun mailed his Reply Brief. In his covering letter he asked leave to introduce two additional exhibits which had been discovered since the hearing in January. These were proffered with supporting affidavits. Before the writer had taken any action relative to the receipt of the additional exhibits, Mr. Lightsey wrote on August 20th protesting their tender by the plaintiff and asking leave to file an additional brief by reason of their receipt. The writer considered that this letter was an acquiescence to the consideration of the exhibits by the court. He had not in fact read these before the receipt of Mr. Lightsey's letter and he studied them only after working through all of the testimony and the earlier briefs filed by counsel. These two exhibits have been marked as plaintiff's Exhibits 4 and 5 and are the letter of Mr. J. W. Godwin of Calhoun Pipeline to Mr. E. L. Cowan of Bowaters dated September 17, 1957, and the letter of Washington counsel to Mr. Godwin dated September 16, 1957, a copy of which letter accompanied the letter from Mr. Godwin to Mr. Cowan. On September 9 Mr. Lightsey mailed his Surrebuttal Brief to the court and it appears that the matter is now ripe for consideration.

This controversy between Bowaters and Carolina Pipeline involves a great amount of money over the remaining years of the twenty-year Contract executed in 1957 and the writer is well aware that, whatever his decision, there

will be an appeal by one or both parties. For this reason, the writer feels that it is desirable to explain terms and to give background information which may be of assistance hereafter in the further consideration of this case.

Carolina Pipeline was organized in the fall of 1955 for the purpose of supplying natural gas to a then unserved area of the State of South Carolina. On March 14, 1956, the South Carolina Public Service Commission granted authority for the new pipeline company to serve a portion of the State of South Carolina. Before and after obtaining the Order authorizing service, Carolina Pipeline negotiated with two suppliers of natural gas. One of these was Transcontinental Gas Pipe Line Corporation, hereinafter referred to as "Transco," which has a pipeline from Texas to the northeast which crosses the Piedmont section of South Carolina. Carolina Pipeline also conducted negotiations with Southern Natural Gas Company which has a line from the gas fields with a terminal at Aiken. During the time when Carolina Pipeline was negotiating for its supplies and arranging its finances, it entered into negotiations with Bowaters which was building a major plant at Catawba in York County. These negotiations resulted in the execution of the Contract of October 4, 1957, which is in litigation in this case. This Contract provided for the sale of preferred interruptible gas and interruptible gas to Bowaters.

The Contract between the parties is twenty-seven pages in length and the writer does not think it necessary to set it out in full as it is attached as plaintiff's Exhibit 1 and defendant's Exhibit C. Before going into the matter of the Contract, it seems necessary to discuss certain terms which are used throughout the testimony and the exhibits. In this connection it is to be borne in mind that Carolina Pipeline is both a buyer of gas and seller of gas.

"Firm gas" is gas purchased subject to contract which insures that the seller will supply a certain volume of gas at all times. Both on purchase by Carolina Pipeline and on sale

by it, such gas is subject to a price based on two factors. One of these is a demand charge. In other words, if a certain number of units is guaranteed, the demand charge is paid for the full assured supply. If the amount of gas taken is less than that to which the customer is entitled he pays only for the gas received. This is the "commodity charge." Thus, the price for firm gas received by Carolina Pipeline or sold by it to its customers is determined by the demand charge covering the amount contracted for and the commodity charge paid on the amount actually taken by Carolina Pipeline or its customers. Gas other than firm gas is "interruptible". Such gas is not available on a guaranteed basis but on an if-as-and-when basis. It is, however, generally divided into two categories: "preferred interruptible" and "interruptible". The customer is not assured of a supply of either but the customer contracting for preferred interruptible will not have its supply cut off until those customers contracting for interruptible gas have been cut off from service.

A gas supplier derives a higher return from firm gas, and, ideally its supply of gas would be marketed on this basis. However, the demand for gas is highly veriable. The supplier must make firm contracts to cover all of its firm commitments. However, over the period of a year, its firm commitments do not take a major portion of the gas which it must have available. The testimony indicates that in the Southeast, by reason of seasonal and even daily differences in temperature, only about 30% of the gas required to meet firm commitments is actually sold as firm gas. In other words, if a supplier must have one million units available for delivery every day throughout the year, it may require the full one million units daily for a cold spell in the winter months but may require only a minor portion of such amount to meet sales on its firm commitment in the summer. This means that approximately 70% of the gas which Carolina Pipeline must have available to meet firm commitments at all times can be sold on an if-as-and-when basis to consumers who can use it as an alternative to another available

fuel. This gas which goes to supply preferred interruptible and interruptible commitments is known in the trade as "valley gas". Such gas is sold to industrial customers. The customer contracting for preferred interruptible pays a higher price but in return benefits from the fact that he will not be denied service until the supply of all interruptible customers has been terminated.

At the time when Carolina Pipeline was negotiating with Transco and with Bowaters, Transco was supplying certain gas to its customers such as Carolina Pipeline on an interruptible basis. This gas, known as E-2, was available on an if-as-and-when basis and was the product either of an overrun or of the availability of valley gas to the intersectional pipeline. When such E gas was available, it was at a favorable price and it was to the financial advantage of Carolina Pipeline to obtain and market as much of it as possible.

In the exhibits two different units are used as a measurement for gas. Sometimes the unit is MCF which means one thousand cubic feet. It is to be noted that this is the measurement for the deliveries from Transco to Carolina Pipeline and is the unit set out in the price escalation clause of the Bowaters Contract. On the other hand, sales to Bowaters are on an MMBTU basis, which is translated into one million British thermal units. It appears that these figures are roughly equivalent as 1000 cubic feet of natural gas has, plus or minus, one million British thermal units.

As indicated above Bowaters and Carolina Pipeline were in negotiation during the time when the Carolina Pipeline system was in the planning, financing and building stage. At that time it was contemplated that Carolina Pipeline would get its natural gas from Transco and would take it from the latter's pipeline at a station at Blacksburg, South Carolina. The system which was then being planned is shown on plaintiff's Exhibit 2 which is a map of proposed facilities prepared by Carolina Pipeline for submission to the Public Service Commission in 1956. During the course

of negotiations, Bowaters' engineers expressed skepticism as to whether the projected pipeline from Blacksburg would be sufficient to take care of Bowaters' needs and those which would arise by reason of the anticipated growth of Carolina Pipeline. Because of this, it was agreed that Bowaters would contribute $210,000.00 to the construction costs of the line from Blacksburg in order to increase the size of such line from Blacksburg to a point near Rock Hill and from the main trnasmission line to the Bowaters plant. The Contract between the parties has provision for this contribution set out in great detail as will be seen by reference to plaintiff's Exhibit 1. The parties are in disagreement as to meaning of this contribution but the writer is of the opinion that it was a part of the consideration for the execution of the Contract of October 4, 1957. This Contract provides in part is follows:

Page 4, Article II, Paragraph 1: "Buyer agrees to purchase from Seller such quantity of natural gas as Seller may from time to time have available up to the entire fuel requirements (excluding Buyer's waste products) of Buyer's plant (estimated at a minimum of 12,000 MMBTU per day and 900 MMBTU per hour) and Seller agrees to supply such requirements when, and to the extent that, it has gas available, it being specifically understood and agreed that deliveries of gas hereunder shall be subject to curtailment or interruption by Seller at any time and from time to time when in Seller's judgment it does not have any gas available, and Buyer hereby expressly acknowledges that Seller shall not be liable in damages for or on account of any curtailment or interruption of deliveries.

\* \* \*

At Page 6, Article II, Par. 3: "Seller agrees that with increased capacity as outlined in paragraph 2 it will have capacity for Buyer's requirements and Seller shall use its best efforts to deliver to Buyer preferred interruptible gas, estimated at 1,200 MMBTU per day approximately ninety-five (95) per cent of the time, and non-preferred interruptible

gas up to 10,800 MMBTU per day eighty to eighty-five percent of the time, and the non-preferred interruptible deliveries shall be interrupted only for the requirements of human needs customers and for preferred interruptible customers, and that Buyer shall be among the last of Seller's non-preferred interruptible customers to be curtailed and among the first to be restored to service.

"Seller further agrees to use its best efforts to supply Buyer's total requirements as set forth herein, and, in order to meet such requirements, Seller agrees during the life of this contract to use Seller's best efforts to increase Seller's gas supply so as to meet Seller's firm gas requirements and enlarge Seller's pipeline system capacity to meet increased demands created by requirements of Seller's sales for resale and for sales of Seller's own distribution system. Seller's present allocation of gas from Seller's supplier of gas is a maximum of 23,612 MCF per day, and as Seller's requirements for sale for resale and for Seller's own distribution systems require this volume to be increased, Seller agrees to use its best efforts to obtain and contract for such volumes of gas as are needed for these types of sales, and use Seller's best efforts to increase Seller's pipeline system to meet these requirements without jeopardizing the capacity being built into the pipeline system for delivery of gas to Buyer.

\* \* \*

At Page 16, Article VIII, Par. 1: "Buyer agrees to pay Seller each month for gas delivered hereunder an amount equal to forty-four (44) cents per MMBTU for the first 1,200 MMBTU consumed per day and thirty-one (31) cents per MMBTU for all excess of 1,200 MMBTU per day. Buyer may increase the 1,200 MMBTU quantity of preferred interruptible gas at any time during the operative period of this contract up to the full quantity of the contract of 12,000 MMBTU per day by giving Seller six (6) months' written notice of each such increase, if Seller has such gas available.

\* \* \*

At Page 17, Article VIII, Par. 4: "In the event that the Commodity Charge for gas purchased by Seller from Transcontinental Gas Pipe Line Corporation is increased above or decreased below twenty-four (24) cents per MCF for contract demand gas under the two-part rate schedule, or the method of billing Seller for commodity charge under the two-part rate schedule is changed by Transcontinental so as to reflect an increase or decrease in Seller's cost of commodity charge for either gas purchased under the two-part rate schedule, the amount of such increase or decrease shall be added to or subtracted from, as the case may be, the price of gas to Buyer as set forth herein."

On Page 10 of the Contract in the first paragraph of Article IV, the following language appears:

"The gas delivered hereunder shall be natural gas, or equivalent as provided for in Paragraph 3 hereof, from *Seller's present or future sources of supply . . .*" (Emphasis supplied.)

The Contract also provided on page 17 for escalation in the event that Transco's prices for E gas were increased. However, this provision of the Contract is not in question before the court at this time. The Contract likewise provided that the buyer should be relieved of its obligation to purchase if the price of gas became noncompetitive with alternative fuel. It likewise provided that if Carolina Pipeline was unable to furnish gas, Bowaters could convert the Contract into one for the transportation of gas to it from the Transco terminal at Blacksburg.

The basic dispute between the parties involves the provision that Bowaters as to its interruptible gas shall be interrupted only for the requirement of human needs customers and for preferred interruptible customers and that Bowaters shall be among the last of seller's non-preferred interruptible customers to be curtailed and among the first to be restored to service. It is the position of Bowaters that this provision gives it a preference among the interruptible customers re-

gardless of the price being paid by customers for interruptible gas. It is the position of Carolina Pipeline that, despite this provision, it is entitled to curtail service to its nterruptible customers on a price basis with the customer paying the lowest price being cut off first.

It is further the position of Bowaters that it is entitled to service regardless of Carolina Pipeline's source of supply. On the other hand, it is the position of Carolina Pipeline that the Contract between the parties contemplated only gas to be supplied by Transco and it was the intention of the parties that Bowaters' interruptible gas was to be provided by Carolina Pipeline from E-2 gas purchased by it from Transco. Carolina Pipeline argues that as E gas is no longer available from Transco and as it is not getting its main supply of gas from Southern at Aiken, it is no longer bound to furnish gas priced on the basis of Transco's gas.

At the hearing in January, plaintiff's counsel objected to most of the testimony of the defendant's witnesses and to the exhibits introduced by the defendant. These were received subject to objections to be stated later, which objections were set out in Mr. Calhoun's Brief filed in July. It was the position of plaintiff's counsel that the Contract was clear and that prior and contemporaneous *parol* agreements were not admissible to explain the document.

The writer is inclined to think that the Contract is ██ by no means so ambiguous as defendant's counsel argue. However, it does contain certain ambiguities and the writer has found it helpful to consider all of the testimony and all of the exhibits. One ambiguity arises from the phrases "among the last" and "among the first" used with reference to the interruption and restoration of the service of interruptible gas. Another is created by the language which apparently assured delivery to Bowaters of preferred interruptible gas approximately 95% of the time and of nonpreferred interruptible approximately 80 to 85% of the time. Apparently Bowaters does not argue seriously that the language in question requires Carolina Pipeline to

meet its requirements for preferred interruptible gas 95% of the time and for interruptible gas 80 to 85% of the time. It would seem to the writer that this language was intended only to express the hope and expectation of the parties and that it was not intended to give any right to Bowaters. Had this been so, there would have been little need for the provision allowing Bowaters to convert a contract for interruptible gas into one for preferred interruptible gas. Moreover, had it been entitled to call for preferred interruptible 95% of the time, it would have been virtually assured of firm gas. The writer finds nothing to indicate that the Contract was intended to give such a right to Bowaters.

The writer, however, is of the opinion that the provision that Bowaters, as to the interruptible gas, shall be among the last curtailed and among the first restored to service subject to the requirements of human needs customers and preferred interruptible customers is a valid and enforceable provision of the Contract of October 4, 1957. This provision would have been easier to interpret had the word "among" been omitted. However, the difficulty of adjusting rapidly to great changes in weather conditions and to great and abrupt changes in supply would seem to the writer to indicate the need for the word "among". With the need for haste in reduction and the requirement for notice to customers, with uncertainty as to the severity and duration of periods of abnormally cold weather, with its inability to control its own source of supply, and with operating problems such as may be caused by pipeline pressure, Carolina Pipeline could hardly curtail and restore service to Bowaters on an absolute "last" and "first" basis. The Contract does not require it to do so. It must, however, be "among the last" of the interruptible customers curtailed and "among the first" restored.

The defendant argues strongly for its procedure of curtailing sales at the cheapest price before those bringing a more adequate return. Its first tariff filed in 1957 apparently made provision for such order of curtailment with

certain types of its customers but not with its industrial customers. It is to be noted that the Public Service Commission by its Order of May 22, 1957, this being defendant's Exhibit F, expressly provided that Carolina Pipeline should be free to negotiate contracts with industrial consumers. The language of this Order is as follows:

"It is further ordered: that this order shall not curtail in any way the right of Carolina Pipeline Company to contract with industrial customers buying directly from the pipeline on terms mutually satisfactory to the respective parties."

It was pursuant to this authority that the Bowaters Contract was made and, in the writer's opinion, that Contract gives Bowaters the right to insist that it not be curtailed on a price basis.

In this connection, it is to be noted that when Carolina Pipeline contracted with Bowaters it had few industrial customers and the price paid by these was almost uniform. These are shown in defendant's Exhibit G. On the other hand, as of October and November of 1970, as shown by defendant's Exhibit S, Carolina Pipeline had 43 industrial customers buying preferred interruptible gas and 27 buying interruptible. Unlike the price picture at the earlier date, the prices shown are very variable with some in each category being much higher than others in the same category and with a few of the preferred interruptible customers paying a lower price than a majority of the interruptible customers. It is to be noted that the prices shown for Bowaters in this exhibit are those being paid under an interim agreement under which the parties to this litigation are operating pending the final disposition of this case. The writer is of the opinion that the 31¢ price for interruptible gas for Bowaters, as modified by the escalation clause based on Transco's commodity charge, would probably have been less than the price of any other interruptible customer with the result that a cut-off based on price would cause Bowaters to be the

first to lose service. In the writer's opinion, this was clearly not the intention of the Contract and Bowaters is entitled to the protection given as to the cut-off even though, absent such contractual limitation, Carolina Pipeline could reasonably use a price cut-off basis for all customers. Had the parties intended that the preference granted Bowaters should be only as to customers paying the same or a lower price it would have been a simple matter to so state. They did not do so and the language used negates such a limitation.

Reference has been made above to the two exhibits tendered by the plaintiff with supporting affidavits on August 13. As stated the writer had not read them or ruled on their admissibility when he received Mr. Lightsey's letter of August 20. He interpreted this letter to concede that the proffered exhibits should be received subject to the right of the defendant to file a Surrebuttal Brief. Had such concession not been made, the writer is of the opinion that the circumstances are such that he should have received and considered the exhibits even over the objection of counsel. These exhibits have been marked as plaintiff's Exhibits 4 and 5. Plaintiff's Exhibit 4 is a copy of a letter dated September 17, 1957, from Mr. Godwin, Chairman of the Board of Directors of Carolina Pipeline, to Bowaters and addressed to the attention of Mr. E. L. Cowan. A copy of this letter went to Mr. T. C. Bannister, Bowaters' Mill Manager at Catawba and the officer who signed the October 4, 1957, Contract for Bowaters. Exhibit 5 is a copy of a letter of September 16, 1957, from Carolina Pipeline's Washington attorneys to Mr. Godwin relative to the Bowaters Contract which copy was enclosed with Mr. Godwin's letter.

The writer did not read or consider Exhibits 4 and 5 until after he had studied the testimony and other exhibits and the plaintiff's and defendant's Briefs in chief. By that time he had reached the tentative conclusion that the provision for curtailment and resumption of service should be interpreted as set out above. He feels that this judgment is strongly supported by the two exhibits in question.

Mr. Godwin's letter is short and to the point. The pertinent paragraph is as follows:

"With reference to our negotiations for the sale of approximately 12,000 MFC of natural gas to your plant, I am attaching hereto a copy of opinion of May, Shannon and Morley to the effect that Carolina Pipeline Company can perform in accordance with the plan which you desired of classifying 1,200 MCF per day as preferred interruptible and 10,800 MCF per day as a semi-preferred interruptible."

The letter from Washington counsel to which Mr. Godwin referred and which he enclosed is as follows:

"This is in response to your request to me by telephone on September 13, 1957 for my opinion with respect to whether, under the circumstances discussed below, Carolina Pipeline Company could place the interruptible gas proposed to be sold Bowaters-Carolina Corporation in a category having a higher priority status than the interruptible gas to be sold to other direct industrial customers. For the reasons set forth below, it is my opinion that such a priority of service may be provided by Carolina to Bowaters.

"I understand that Carolina proposes to sell to Bowaters up to 12,000 Mcf of natural gas per day of which volume the first 1,200 Mcf per day would be in the same preferred classification as the gas to be sold to others in this category. It is not this gas which is concerned here but the 10,800 Mcf balance. It is also my understanding that in consideration for receiving a higher priority for this 10,800 Mcf than would be accorded other non-preferred interruptible sales, Bowaters would contribute to Carolina the estimated $225,000.00 cost to enlarge approximately 25 miles of the main pipeline from 10¾" to 12¾" diameter pipe, and to enlarge approximately 3½ miles of lateral line from 4½" diameter to 6⅝".

"In this regard I have reviewed Carolina's contracts with Celanese Corporation of America, Rock Hill Printing and Finishing Company, Ashe Brick Company, Carolina Ce-

ramics, Inc., Cheraw Brick Works and Palmetto Brick Company. A comparison of these contracts with Carolina's other direct industrial contracts should be made to determine whether the service provisions are the same as those enumerated.

"It is clear from a review of the above specified contracts that the delivery of any gas under these agreements is subject to the sole discretion of Carolina. However, all of such agreements provide for the sale of at least some portion of the contract volume as 'preferred interruptible' gas which would be in the same category as the 1,200 Mcf out of the total 12,000 Mcf per day proposed to be sold to Bowaters. It would be necessary to treat this classification of service on a reasonably equal priority basis. With respect to the non-preferred volumes, there is no priority of curtailment or service resumption granted.

"Accordingly, it is my opinion that the balance of the 10,-800 Mcf per day remaining of the Bowaters' volume could, in consideration for the substantial monetary contribution involved, be given a priority and preference over the non-preferred interruptible gas to be sold directly to other industries. The granting of such a priority or preference to Bowaters would not be in conflict with any of the contracts which I examined."

It is to be noted that the letter from counsel expresses the unequivocal opinion that Bowaters, in consideration of its contribution of capital, could be given a priority and preference over non-preferred interruptible gas customers. Mr. Godwin uses the term "semi-preferred interruptible" with reference to the gas which Bowaters was to get daily over and above its preferred interruptible. The writer feels that the use of this term is significant and that the net effect of the contract provision as to curtailment and resumption of service is to give Bowaters a "semi-preference" as to its interruptible gas. The consequence of such semi-preference under the contract is that price is not to be a factor in determining curtailment or resumption of service.

At page 23 of its Brief defendant argues that the plaintiff, in urging its interpretation of the curtailment and restoration clause, is seeking, contrary to State law, to have the court order discrimination against other customers of the defendant. In support of this Sec. 58-119 of the Code of 1962 is cited. The section in question authorizes the Public Service Commission to have hearing and issue orders to correct such matters as discrimination or preference in rates or classification of public utilities. In the writer's opinion there are several answers to this argument. The first is that the Public Service Commission is not seeking to act. The second is that Carolina Pipeline entered into the Bowaters Contract under the authority explicitly granted "to contract with industrial customers buying directly from the pipeline on terms mutually satisfactory to the respective parties". This clearly permitted a diversity in prices and terms of delivery applicable to direct industrial customers. Moreover, if treatment which is not uniform as to all members of a class is to be considered discriminatory or preferential and as such in violation of law, it would appear that Carolina Pipeline's current sales prices to all direct industrial customers, as set out in its Exhibit S, would be subject to attack under Sec. 58-119.

Defendant further argues at page 19 of its Brief that the adoption of plaintiff's interpretation of the curtailment and restoration clause would make the seller's judgment provision of the Contract "totally meaningless and useless". The writer does not agree.

The judgment provision is set out in Paragraph 1 of Article II of the Contract which is quoted above. This clause of the Contract expressly provides for curtailment of gas delivery at any time "when in Seller's judgment it does not have any gas available" and it exonerates Carolina Pipeline from damages on account of any curtailment or interruption of deliveries. This provision precedes and is to be construed in conjunction with Paragraph 3 of the same Article which sets out the curtailment and restoration pro-

vision applicable to deliveries of interruptible gas to Bowaters. At page 13 of its Brief the defendant acknowledges that the judgment provision does not allow it "total discretion" in making the appropriate determinations as to curtailment or restoration of service. It urges that the plaintiff has the burden of proving that defendant's exercise of discretion has been unreasonable, arbitrary or capricious. The defendant urges further that its curtailment on the basis of price is both reasonable and in accord with the custom of the industry. In the writer's opinion, however, the judgment provision is clearly limited by the curtailment and restoration provision of the Contract. In view of the latter provision, it is arbitrary and unreasonable for Carolina Pipeline to consider price as a factor in determining whether or not it has interruptible gas available for delivery to Bowaters. However, even though price is not to be considered, there will doubtless be many occasions when Carolina Pipeline will have to consider other factors in making its determination as to the availability of interruptible gas for delivery to Bowaters.

Carolina Pipeline argues that the Bowaters Contract is to be limited to the Transco source of supply which was its only source of supply in 1957. As evidence of this, it cites the escalation clause which is tied to the Transco tariff and is unlike the earlier Carolina Ceramics Contract which provided escalation on the basis of Southern as well as Transco prices. The writer is of the opinion that this provision of the Contract is clear and that the Contract is to provide gas regardless of source. Certainly, it was anticipated that the Carolina Pipeline system would grow and that it would need an additional source of supply. This is evidenced by its own map made in 1956 which is plaintiff's Exhibit 2. The Contract with Bowaters, in the writer's opinion, clearly anticipated additional sources of supply and obligated Carolina Pipeline to seek such to meet increasing demands. See Article 11, Par. 3 quoted above. There is no provision in the Contract to limit the

availability of gas to Bowaters if Carolina Pipeline failed to receive the E gas which it hoped to get from Transco. The supply of such gas was always very problematical. Indeed, in the memorandum of October 1, 1957, from Mr. Godwin to Mr. Warren relative to Bowaters, which is defendant's Exhibit D, the writer, who was then and is now Chairman of the Board of Carolina Pipeline, writes as follows:

"Transcontinental stated that they thought we could render adequate service but they could not guarantee any E gas."

To the writer, it seems obvious that the interruptible gas provided by Carolina Pipeline to its industrial customers has been largely valley gas rather than E gas. The 1970 annual report of Carolina Pipeline, which is plaintiff's Exhibit 3, has historical statements set out on page 12. From these tables it appears that over the years from 1959 to 1970 approximately half of the total sales of the company by volume have been of industrial interruptible gas. This is true even though E gas from Transco virtually dried up as early as 1966. From Exhibit J it appears that Transco delivered E gas to Carolina Pipeline on 82 days in '66, 38 days in '67, 3 days in '68, and no days in '69. By comparing Carolina Pipeline's purchases of E gas as shown on its Exhibit K with its annual sales of industrial interruptible as shown in its annual report, it will be observed that a relatively minor part of its industrial interruptible gas was derived from E gas in the years '59-'62 when Southern gas was not a factor. This comparison is as follows:

| For Fiscal Yrs. Ending March 31 | MFC E 2 Gas Purchased From Transco | MFC Gas sold by Carolina Pipeline as Industrial Interruptible * |
|---|---|---|
| 1959 | 1,371,990 | 4,392,439 |
| 1960 | 2,274,620 | 4,544,186 |
| 1961 | 614,121 | 3,366,425 |
| 1962 | 590,007 | 4,876,932 |

* Does not include Industrial Preferred Interruptible.

By reference to defendant's Exhibit K it will likewise be seen that in each of the two fiscal years ending March 31, 1961 and 1962, Carolina Pipeline's sales of interruptible gas to Bowaters exceeded its purchases of E gas from Transco.

In the defendant's testimony, it is indicated that it was the drying up of E gas from Transco which forced it to build the line from Camden to Aiken to secure Southern gas, such line having been completed in October, 1961. The writer would, however, express the opinion that it was the great and gratifying growth of Carolina Pipeline's system that required the extension of its line to get the second source of supply. This is evidenced by the fact that, as shown by Exhibit K, Carolina Pineline purchased more than 2 million MCF of E gas in only two years. These were '59-'60 and '64-'65. On the other hand, as evidenced by defendant's Exhibit N, their purchases from Southern caught and surpassed their greatly increased purchases from Transco in 1969. As indicated in its annual report, Caroline Pipeline's sales in volume of gas has increased by more than five times since 1959 and of 34,151,226 MCF sold in the fiscal year ended March 31, 1970, the total of industrial interruptible was 16,855,155 MCF.

As the writer sees it, the 1957 Contract is not tied to any source of supply and is to be honored so long as the defendant has interruptible industrial gas available from any source. In this connection the plaintiff cites the case of *Kansas-Nebraska Natural Gas Company v. Consumers Public Power District*, 179 Neb. 687, 140 N. W. (2d) 10. While this case is distinguishable in certain particulars, the writer finds it to be very persuasive.

As stated, the escalation clause in the Bowaters Contract, which has been made effective over the years as is evidenced by prices shown in Exhibit K, was based on the commodity charge of Transco for firm gas sold to Carolina Pipeline. As it turns out, it would have been well to have used an escalation formula based on the cost of all gas purchased by Carolina Pipeline but it is to

be noted that no problem arose until the price of Southern gas exceeded the price of Transco gas. In this connection, see the letter from Mr. Warren of Carolina Pipeline to Mr. Hair of Bowaters dated February 18, 1970, and set out as defendant's Exhibit P. As the writer sees it, the escalation clause was favorable to Carolina Pipeline until the recent increase in the price of Southern gas. Now, it is obviously unfavorable but the writer is of the opinion that this is a consequence of the Contract made by the party and that the court can and should give no relief. It would have been preferable for the defendant had such an escalation clause been used as is set out in its present tariff as revised January 1, 1971, which is defendant's Exhibit R, which provides for escalation on the basis of weighted average cost. Escalation based only on Transco's commodity charge may, of course, continue to be unfavorable for Carolina Pipeline until the expiration of the Contract in 1979. On the other hand, Southern's price might be reduced or Transco might receive approval from the Federal Power Commission for a price increase of such a substantial size that the escalation clause set out in the 1957 Contract might again be more favorable to Carolina Pipeline than one based on weighted average cost.

Now, in view of the foregoing, it is the judgment of this court that the Contract of October 4, 1957, is to be interpreted and construed as follows:

1. That Paragraph 3 of Article II does not require that the defendant deliver to the plaintiff preferred interruptible gas 95% of the time and non-preferred interruptible gas 80% to 85% of the time.

2. That Paragraph 3 of Article II does require that the defendant's deliveries of non-preferred interruptible gas to the plaintiff shall be interrupted only for the requirements of human needs customers and for preferred interruptible customers, and that plaintiff shall be among the last of defendant's non-preferred interruptible customers to be curtailed and among the first to be restored to service.

3. That the defendant in exercising its judgment as to the availability of gas to be delivered to the plaintiff as non-preferred interruptible gas shall not consider the price paid by the plaintiff and other customers as a factor.

4. That the obligation of the defendant to deliver gas to the plaintiff is not limited to gas procured by the defendant from Transco and applies to gas obtained from whatever source.

5. That the prices to be charged by the defendant and paid by the plaintiff shall be those set out in Paragraph 1 of Article VIII as modified or adjusted by Paragraphs 2, 3 or 4 of the same Article and any amount paid by the plaintiff in excess of the prices so determined shall be refunded by the defendant with interest at the legal rate. And

It is so ordered.