15339

SOULIOS v. MILLS NOVELTY CO.

(17 S. E. (2d), 869)

358

*Mr. H. H. Woodward,* of Conway, and *Mr. John I. Cosgrove,* of Charleston, for appellant,

*Mr. E. S. C. Baker,* of Conway, for respondent,

December 9, 1941.

The opinion of the Court was delivered by MR. CHIEF JUSTICE BONHAM.

This is an action to recover damages, actual and punitive, for an alleged breaking and entering of the premises of the plaintiff by the agent of the defendant, and removing therefrom a part of the plaintiff's property, and of damaging, ransacking, and destroying other of plaintiff's property.

The defense was a general denial, and the pleading of a conditional sales contract or chattel mortgage, under which defendant had sold to plaintiff an ice cream freezer; that a title retention contract was given to secure to defendant the payment of the credit part of the sales price of the freezer; that the said contract provided that upon default in the provision for the said payment, the defendant should have the right to enter upon the premises of plaintiff and repossess the said property; that plaintiff was in default in his payments, and had abandoned possession of the property and had left it in the premises he had occupied at Myrtle Beach, South Carolina; and that on or about the 10th day of December, 1938, the defendant, by its agent, peaceably entered on the premises of plaintiff at Myrtle Beach, South Carolina, and peaceably repossessed the property in dispute.

The case came on to be heard before the Honorable J. Strom Thurmond, presiding Judge, and a jury, at Conway, Horry County, at the February, 1941, term of the Court of Common Pleas, and resulted in a verdict for plaintiff in the sum of two thousand five hundred ($2,500.00) dollars, actual and punitive damages.

It appears from the record that the plaintiff, and an agent of the defendant, first entered into a contract for the purchase of the ice cream freezer at the agreed price of two thousand and twenty-four ($2,024.00) dollars, on the 16th day of May, 1938, which was signed by plaintiff and sent

into the Mills Novelty Company at its place of business in Chicago, Illinois, accompanied by a check for $376.00 as the down payment for the machine. This contract was refused by the defendant company, and a new contract which fixed the down payment at $680.00, was signed by the plaintiff and, along with a check for $680.00, was returned to, and accepted by, the defendant.

At the conclusion of the evidence, a motion for a directed verdict in its favor was made by the defendant, on the ground that it appears by the evidence that the plaintiff was in default in his payments for the machine. The motion was overruled. His Honor did not assign his reason for such ruling; and after the rendering of the verdict the defendant moved for a new trial on the grounds stated in the record, which motion was likewise refused.

The defendant appeals from the verdict and judgment in this case upon exceptions, thirteen in number, which make for our consideration the following questions:

Was the Court in error in refusing the motion for a directed verdict, and the motion for a new trial made after the verdict was rendered?

Was the Court in error in admitting the testimony of the plaintiff in regard to the time when the first payments under the title retention contract were fixed to begin?

Was the trial Judge in error in charging the jury upon the question of waiver by the defendant of the provisions of the contract relating to the question of default by the plaintiff?

Was the Court in error in permitting plaintiff's counsel to show a magazine to the defendant's witness, and to question him thereto, and have him read therefrom, in the presence of the jury, upon the question whether the defendant handled or sold slot machines?

Was the Circuit Judge in error in charging the jury upon the question of trespass?

Was the Judge in error in submitting to the jury the issue of damages to property not covered by the retention title contract?

The question that confronts us at the opening of the consideration of this opinion is this: Did the presiding Judge err in overruling the motion for a directed verdict, which motion was predicated upon the ground that the evidence showed that the plaintiff was in default in his payments?

It has long been the established rule of this Court that if there is a scintilla of relevant, competent testimony, pro and con of the issues involved, it is the duty of the Judge to submit the case to the jury; such is the provision of our Constitution of 1895. In the case of *Turner et al. v. American Motorists Insurance Co.*, 176 S. C., 260, 180 S. E., 55, 56, this Court said:

"The appellant labors under the erroneous idea that the Supreme Court has overruled the pronounced principle, to wit, if there is any relevant testimony, amounting to a scintilla, it must be left to the jury to determine its force and effect. The meaning of the rule is that there must be some *evidence* arising out of the testimony which elucidates the issues of fact, and which enables the jury to form an intelligent conclusion. * * *

"In the case of *Taylor v. [Atlantic Coast Line] Railway Co.*, 78 S. C., 552, 556, 59 S. E., 641, 643, this Court said: 'A scintilla of evidence is *any material* evidence that, if true, would tend to establish the issue in the mind of a reasonable juror.' (Italics added.)

"Whilst adhering to the scintilla rule, this court has recognized a rule supplemental to the scintilla rule, which is thus propounded in the case of *National Bank v. Thomas J. Barrett, Jr., & Co.*, 173 S. C., 1, 174 S. E., 581, 582: 'If it be conceded that there may be deduced by a process of unusual finesse of reasoning that there is a scintilla of evidence * * * nevertheless there is another rule, more founded upon common sense and reason to the effect that when only one reasonable inference, not just one inference, but one reasonable inference, can be deduced from the evidence, it becomes a question of law for the court, and not a question of fact for the jury '     * * * * *

"This declaration is but to say that the scintilla of evidence upon which a case should be sent to the jury must be real, material, and pertinent and relevant evidence * * *.'

We think upon a consideration of the record in this case, that the Judge had no other course to pursue than to submit this case to the jury.

The cardinal issue upon which this question turns is: When did the payments of the credit portion of this contract begin? The contract is silent on that subject. The plaintiff testified that the agent with whom he contracted for the purchase of this machine told him that he would have four or five months from the date when the appellant contended that the payments were to begin, in which to begin his payments, and he states in his testimony that when he made his first contract he had sent a check for $376.00 as a down payment. This was refused by defendant, and he had to sign a contract for $680.00 down payment, and to make that payment, which he did. The plaintiff testified further that he had about $1,300.00 with which to begin business at Myrtle Beach, and that this unexpected payment of $680.00, after meeting the expenses at the beginning of his business, left him with very little money, and that with this showing the agent assured him he would have four or five months in which to begin his payments. This, of course, is denied, but the person with whom he made the contract was not presented as a witness at the trial.

We do not think it requires the citation of authority to say that the rule is that when the written instrument is silent as to an important issue thereof, parol testimony is admissible to prove it.

In the case of *Willis v. Hammond,* 41 S. C., 153, 19 S. E., 310, 314, this Court said: "* * * It is admitted that unless the contract of 29th March, 1889, was a complete unity, and therefore did not need anything to make it plain and operative, a resort to anything legally competent to make it plain, as expressing the agreement of the parties, to such contract, is admissible. We have just seen,

under the second division of this opinion, that it was not such a complete unit, in itself, and that it thereby opened the way to testimony showing the precedent arrangements of the parties to this contention. While it is a general rule that a contract in writing, complete in all its terms, draws into it all parol contracts preceding it, yet, it fails to state the consideration, if it uses terms that need explanation to be understood and applied, or if it is only a part of a general whole, it is perfectly competent to supply all these missing qualities by testimony giving all the precedent agreements of the parties. * * *"

In the case of *Ashe v. Carolina & Northwestern Railway Co. et al.*, 65 S. C., 134, 43 S. E., 393, 394, Mr. Justice Gary, speaking for this Court, used the following language: "* * * When the written evidence of the contract does not contain all the terms of the transaction between the parties, parol evidence (not contradicting or varying the writing) is admissible for the purpose of showing a contemporaneous independent agreement entered into between the parties. * * * The written evidence of the contract being silent as to the time in which the money was to be paid, parol testimony was admissible to show such fact, as it did not alter, vary, or contradict the writing. * * *"

Also, in the case of *Midland Timber Co. v. Furman et al.,* 111 S. C., 287, 97 S. E., 831, this Court said: "To use a simile, if a span of a bridge be missing, that circumstance is manifest on casual observation, and the conclusion is instant that the whole structure is not present. So here, if the paper writings laid down show upon their face an incompleteness, then that which makes them complete may be shown by parol. * * *"

Defendant counters against this evidence by showing that the plaintiff sent them a check for $74.80 in July, as a first payment, which it alleges conforms to the provisions of the contract, and that this is an acknowledgment of when the payments were to begin, and that they had sent him a book of coupons that showed when the payments were to

begin; but these coupons were not offered in evidence, although plaintiff admitted that he received the book. That, of itself, makes an issue of fact that had to be decided by a jury, because the contract is silent as to when the payments were to begin.

Appellant contends that it was error for the presiding Judge to admit the evidence of the plaintiff that defendant's salesman with whom he contracted to purchase the freezer had assured him that he would have four months in which to begin the payment of the credit portion of the purchase price.

The plaintiff wrote a letter to the defendant on October 6, 1938, in which he said: "Regarding the account due you I am very sorry that I have fallen behind * * *. If you will work with me I will pay it all."

He sent them seven checks in the sum of $25.00 each, and said: "I am enclosing 7 checks in the amount of $25.00 each, one for immediate payment and one for each month till the first of April. After that time I will meet the regular payments as they come due."

They cashed the first of those checks, which was payable in October, and the second, which was payable in November; and after that they wrote him a letter saying that they would not acept his proposition. That made the important issue as to whether the plaintiff was in default a question for the jury, upon the issue whether the defendant had thereby waived the strict provisions of the contract.

The plaintiff himself stated that he was not in default that he had paid them up until the time that his property was seized in December. It is true that his testimony may be contradictory of the letter written, and, indeed, of his own statements, but this Court has more than once held that the jury is the judge of which contradictory statement of the witness is the truth.

The property was seized December 10, 1938. Plaintiff had paid $78.40 in July, $25.00 on or about October 10, 1938, and $25.00 on or about November 1. This was sufficient to pay what he said he had contracted to pay, beginning four or five months after the date when the appellant contends that the payments were to begin. This is evidence in addition to that pertaining to waiver, which was properly submitted to the jury.

We think the Court did not err in submitting to the jury the question of whether the plaintiff was in default in his payments. This question as to whether plaintiff was in default was the cardinal one in the whole case, and one of much importance to the plaintiff. He had a strong equity in the case. He had used the property for only two or three months, and had left it securely locked in his place of business at Myrtle Beach, and had gone to Kinston, North Carolina, for the purpose, he said, of making money, and had written the letter which has already been referred to, and had sent the checks which have been discussed, from Kinston, these seven checks having been enclosed in the letter which he wrote them from that point. The first of these checks, in the sum of $25.00, payable to the Mills Novelty Company and subsequently endorsed and accepted by them, was dated at Kinston, North Carolina, and was drawn on the First Citizens Bank and Trust Company, presumably of Kinston, and the check was paid by that bank. The appellant was, therefore, almost certainly bound to know where he was.

The plaintiff had made a down payment of $680.00. He had paid $78.40 in a subsequent payment, and had made two further payments of $25.00 each, and, also, the expenses of the transportation and the setting up of the machine. The question of waiver, and as to when the payments under the credit portion of the contract began, were of primary importance in the trial of the case. We think the evidence justifies the action of the trial Judge in refusing the motion for a directed verdict.

During the taking of the testimony, the attorney for the plaintiff was cross examining Mr. Corvette, a witness for the defendant, and exhibited to him a magazine from which he asked him a series of questions. We quote here from the record:

"Q. I want to ask you, Mr. Corvette, if that is one of the advertisements of your company? (Hands magazine to witness) A. I don't know, sir. I don't have this magazine, neither do I have anything to do—

"Q. You see that—that is the Mills Novelty Company you represent? A. Yes, sir.

"Q. Will you look down there and see that? A. That is Mills Novelty Company while this is really Keystone Novelty.

"Q. Are they connected? A. I wouldn't know about that.

"Q. It says Mills— A. They might be distributors of Mills.

"Mr. Ford: We desire this marked for identification.

"Mr. Woodward: I object to this being put in evidence.

"Mr. Ford: We wish this marked for identification. Page 31, in two places, marked plaintiff's identification No. 1."

Also, during the cross examination of the same witness by the same attorneys the following colloquy transpired:

"Q. Did you service their slot machines that they put out? A. No, sir, only their refrigerator equipment.

"Mr. Woodward: Your Honor, I think that is going too far.

"Witness: I have no connection with anything except their refrigeration equipment.

"Q. I want to know what you service? A. Drink equipment and refrigerators, are the only thing I service.

"Mr. Woodward: I think it is unfair to the witness. I think he is brow-beating the witness.

"Jury excused.

"The Court: What do you object to, Mr. Woodward? I don't think he is brow-beating the witness. He has calmed his voice.

"Mr. Woodward: It is the same as alleging here before the jury that they do make slot machines.

"Mr. Ford: If they do make them why are they ashamed of it?

"Mr. Woodward: I don't think they make slot machines.

"The Court: I am going to over-rule that and let those questions stand unless Mr. Ford wants to withdraw them."

His Honor admitted the questions asked the witness over defendant's objections. We think this was error.

It appears to us that these questions, and the exhibition of the magazine to the witness, in the presence of the jury, were clearly for the purpose of prejudicing the minds of the jury, because it is of general public knowledge that the handling of slot machines brings those who so handle them into public disfavor, because the use, in many instances, of these machines, is a gambling device, and this was an issue utterly foreign to the case.

His Honor fully charged the jury upon the law as to what constitutes conversion, and we think he was correct thereabout. He thus made plain to the jury that the repossession must be effected without a breach of the peace.

In the case of *Childers v. Judson Mills Store Co. et al.*, 189 S. C., 224, 200 S. E., 770, 773, this Court said:

"The guiding principles of law in instances of this kind are clearly enunciated in *Willis v. Whittle, supra* [82 S. C., 500, 64 S. E., 410], from which we quote:

" ' * * * The right to seize carries with it by necessary implication the right to do whatever is reasonably necessary to make the seizure, including the right to peaceably enter upon the premises of the mortgagor.

" 'There is one restriction, however, which the law imposes upon this right. It must be exercised without provoking a breach of the peace; and, if the mortgagee finds that he cannot get possession without committing a breach of the peace he must stay his hand, and resort to the law, for the preservation of the public peace is of more importance

to society than the right of the owner of a chattel to get possession of it. * * * ' "

In the case of *Webber v. Farmers Chevrolet Co. et al.*, 186 S. C., 111, 195 S. E., 139, 141, Mr. Justice Fishburne, speaking for the Court, said:

"We think the issue is concluded adversely to the defendants by the recent case of *Lyda v. Cooper, 1933*, 169 S. C., 451, 169 S. E., 236, 238. In that case, the Court held that it was a question for the jury as to whether there was a trespass and breach of the peace, where the agent of a furniture company, in repossessing property sold on the installment plan, under a conditional sales contract. finding the house of the plaintiff closed, during their absence, entered through a window, opened the doors and carried away the furniture. In that case, too, it appeared that the condition of the contract was broken, and the plaintiffs were in default in making their payments.

"In defining what constitutes breach of the peace, the following principles of law were quoted with approval in *Lyda v. Cooper, supra*:

" ' "In general terms, a breach of the peace is a violation of public order, a disturbance of public tranquility, by any act or conduct inciting to violence." Annotation to case of *Kansas v. Herbert*, 48 A. L. R., 85.

" ' "By 'peace,' as used in the law in this connection, is meant the tranquility which is enjoyed by the citizens of a * * * community, where good order reigns among its members, which is the right of all persons in political society. * * * It is not necessary that the peace be actually broken to lay the foundation of a prosecution for this offense. If what is done is unjustifiable, tending with sufficient directness to break the peace, no more is required." ' " .

The appellant contends that plaintiff had abandoned this property, and that they could not find him when they went to seize it. We do not think this is borne out by the facts of the case. They knew by the checks which Soulios sent them, that Soulios was at Kinston, North Caro-

lina, where, as has been seen, he stated that he was working in an effort to make some money with which to meet his obligations, and there is no evidence that they tried to communicate with him there, other than to write him a letter on November 4, 1938, after they had accepted his October and November checks.

The appellants contend also that they could not find Soulios. Aside from their knowledge that he was at Kinston, North Carolina, there is evidence that they were informed that Soulios would be at Myrtle Beach the afternoon that the property was seized, and it appears that he did come there that afternoon, but that they did not wait. There is also evidence that the keys to the building in which the property was locked, except the keys to the padlock which Soulios had put on the property, had been given them by a person who was not the landlord of the property and could not authorize them to enter the building. Even after receiving these keys, they took out the staple and took off the padlock, thus committing a breach of the peace, in the opinion of this Court.

When his Honor came to charge the jury, he made this statement to them: "Now, Mr. Foreman and gentlemen, counsel for both sides have agreed that there is no counterclaim in this case and they have just agreed to submit this one, straight issue to you: Whether or not the plaintiff is entitled to any damages, actual, or actual and punitive, on account of the alleged conversion of the property in question * * *."

The trial Judge also charged the jury upon the law of actual or compensatory damages, and punitive damages. At the conclusion of his charge, the attorney for the plaintiff stated: "Your Honor, I don't agree that the action was solely for conversion because there are allegations of trespass also."

Thereupon the Court sent the jury out, but made no ruling upon this question. When the jury returned, he charged them again, upon the law of punitive damages. He had, in his general charge, charged them upon the law of trespass, but

after the jury was returned to the Court, he did not again say to them that the issues were restricted to the question of conversion. It will thus be seen that his Honor charged the jury on the law of trespass, although he had already instructed the jury that the question of trespass was eliminated by agreement of counsel.

Herein we think his Honor committed error. He had expressly limited the issues to the question of conversion. The logical conclusion is that he intended to eliminate, and did eliminate, the question of trespass. Nevertheless, the issue of trespass was unquestionably submitted to the jury, and it is a natural conclusion that in reaching their decision, and in reaching their verdict of actual and punitive damages, it was necessarily considered by them.

His Honor had fully and correctly charged the jury on the law of conversion. When he continued and charged them on the law of trespass, he was charging upon an issue which he had expressly said was eliminated from the jury. This must of necessity have confused the jury as to what they were entitled to decide.

We also think that his Honor should not have permitted plaintiff's attorney to exhibit to the jury the advertisements of slot machines as proof of the defendant's connection therewith. This was absolutely foreign to the issues made by the pleadings, and its sole purpose must have been to prejudice the jury against the defendant. In the case of *Edwards v. Union Buffalo Mills. Co. et al.,* 162 S. C., 17, 159 S. E., 818, 819, in discussing the reference by counsel to a medical book which counsel had sought to introduce in evidence, this Court said:

"If it was error for counsel thus to refer to the excluded medical book, it was not cured by the mild admonition of the Court which went unheeded by counsel. * * *

"To read such a book to the Court or the jury is to make of the author of the book a witness for the party introducing it, which witness the other party has no opportunity to cross examine. In addition, it is hearsay testimony."

In the case of *Major v. Alverson et al.,* 183 S. C., 123, 190 S. E., 449, 451, Mr. Chief Justice Stabler, in speaking for this Court upon the question of the use by counsel of abusive language, said: "This Court does not desire to penalize a litigant because of the conduct of his counsel in the trial of a case; but where counsel, as in this case, uses improper and abusive language in his argument to the jury, to the clear hurt and prejudice of the complaining party, we feel that it is our duty to remand the case for trial in accordance with correct and proper rules of procedure and conduct.   *   *   *"

This Court again passed upon the question of statements and argument by counsel, of a nature tending to prejudice the minds of the jury, in the case of *Hubbard v. Rowe et al.,* 192 S. C., 12, 5 S. E. (2d), 187, 192. In that case it was held:

"It is conceded that on several occasions during their argument to the jury, counsel for the plaintiff made statements that were immediately objected to by counsel for the company as being highly improper and prejudicial to the appellant.   *   *   *

"We think that some of the statements made were clearly improper, and tended to prejudice the rights of the appellant. It is true that the trial Judge directed plaintiff's attorneys to confine their remarks to the record, and charged the jury generally that they should disregard any statements of counsel which were beyond the scope of proper argument and which the Court had ruled incompetent. However, we are of opinion that the action taken by him did not cure the harm done. We think that he should have specifically ruled upon appellant's objections, and further and more fully instructed counsel for plaintiff to desist from making improper remarks, and to have charged the jury to disregard in reaching their verdict the particular objectionable statements made."

The question of argument by counsel of matters tending to prejudice the minds of the jury is further discussed in

the recent case of *Lemons v. Pilot Life Insurance Co.*, 196 S. C., 297, 13 S. E. (2d), 278.

The Judge charged the jury that the title retention contract was, under the laws of South Carolina, a chattel mortgage. It is the rule in this State that such title retention contracts are, in effect, chattel mortgages, but we do not think that the title retention contract exhibited in this case is in all respects a chattel mortgage. It gives the defendant the power, upon default of payment, to repossess the property and to do with it as the defendant pleases, and it further provides that the payments made shall be held by it as liquidated damages.

There was evidence that the defendant had removed certain personal property, not covered by the title retention contract, from the premises of the plaintiff. However small the value of such personal property might have been, we do not think that the trial Judge was in error in permitting the issue of its removal to be passed upon by the jury. Aside from the fact that there was testimony as to its value, the question involved here was less as to its value than whether or not the defendant had the right to remove it, and we think that, under the evidence, this was properly a matter for the jury to determine.

We have not specifically passed upon each of the exceptions made by the defendant, but we have carefully considered all of them, and in effect have passed upon them.

In our judgment, the errors on the part of the presiding Judge, above pointed out, entitle the defendant to a new trial. Accordingly, the judgment is reversed and the case is remanded to the Circuit Court for a new trial.

MESSRS. ASSOCIATE JUSTICES BAKER, FISHBURNE and STUKES and MR. ACTING ASSOCIATE JUSTICE G. DUNCAN BELLINGER concur.