## 22211

DUKE POWER COMPANY, Lewie E. Amick, Jr., Richard L. Wash and Mrs. Olan B. George, Appellants-Petitioners, of whom Duke Power Company is, Appellant-Respondent, v. SOUTH CAROLINA PUBLIC SERVICE COMMISSION, County of Greenwood, South Carolina, and Edward L. Petit, Jack C. Bourne and Jones F. Buchanan are, Respondents-Appellants, of whom County of Greenwood, South Carolina, Edward L. Petit, Jack C. Bourne and Jones F. Buchanan are, Respondents-Appellants. Appeal of COUNTY OF GREENWOOD, S. C., Edward L. Petit, Jack C. Bourne and Jones F. Buchanan, Respondents.

(326 S. E. (2d) 395)

Supreme Court

*Andrew B. Marion* and *Donald L. Ferguson*, of *Haynesworth, Perry, Bryant, Marion & Johnstone*, Greenville, *for appellant-petitioner Duke Power Co.*

*Eugene C. Griffith*, of *Griffith, Mays, Foster & Kittrell*, Newberry, *for individual appellant-petitioners.*

*John E. Johnston*, and *Jack H. Tedards, Jr.* of *Leatherwood, Walker, Todd & Mann*, Greenville, *for respondents-appellants, Edward L. Petit, Jack C. Bourne, and Jones F. Buchanan.*

*Thomas E. McCutchen* and *Stewart P. Hayes* of *Whaley, McCutchen, Blanton & Rhodes*, Columbia, *for respondent-appellant Greenwood County.*

*Arthur G. Fusco* and *C. Dukes Scott*, Columbia, *for respondent-appellant South Carolina Public Service Comm.*

Heard Oct. 16, 1984.

Decided Jan. 15, 1985.

HARWELL, Justice:

This is a utility rate case involving the interpretation of a contract between Respondent Greenwood County and Appellant Duke Power Company and the constitutionality of the special enabling legislation. The trial judge held the contract enforceable against Duke and the Act constitutional. We affirm.

Greenwood County owned and operated a hydroelectric facility near Buzzard Roost on the Saluda River from 1940 until 1966. *See Taylor v. Davenport*, 281 S. C. 497, 316 S. E. (2d) 389 (1984). In 1965, the Greenwood County Electric Power Commission recognized the need to increase its available supply of electric power in order to service the growing population of Greenwood County. A member of the South Carolina House from Greenwood County contacted Duke Power to determine whether Duke would be interested in purchasing the Greenwood system.

Duke tendered an offer in a letter dated May 28, 1965. The offer provided generally that Duke would lease the hydroelectric facility at Buzzard Roost for forty years at $250,000 per year, and would purchase the remaining electric facilities owned by Greenwood County for about 13 million dollars. With regard to electric rates, Duke's offer specifically provided:

> ... We now tender with this letter an offer which will:
>
> .    .    .    .    .
>
> E. Maintain the same, or lower, electric rates for all customers of the Greenwood Electric Systems.
>
> .    .    .    .    .
>
> 6. As to all customers other than municipalities and cooperatives, Duke Power Company systemwide rates will be applied to those Greenwood County customers whose bills would be lower on Duke rates. On those Greenwood customers whose bills would be higher on Duke rates, the Greenwood County rates will be left in effect. Thus, no customer will receive an increase in rates and 30% of

.

the customers will receive reductions in rates, totaling about $41,000 annually. Duke rates would be applied to all new connections after consummation of the sale.

The statutes empowering Greenwood County to borrow funds to finance its electric system and creating the County Power Commission (Act No. 1095, 1934; Act No. 329, 1939) did not give the Commission power to sell the property. Therefore, the General Assembly enacted Act 1293 of 1966 for this purpose. Act 1293 provided for a referendum of Greenwood County voters to decide whether or not the system would be sold to Duke. The Act also provided, in pertinent part:

SECTION 4: The terms and conditions of the sale are as follows:

. . . . .

3. The rates to be charged for electric power for all connections which exist at the consummation of the sale shall be the lower of the rates charged by the Greenwood County Electric Power Commission and Duke Power Company and the same shall not be grounds for any claim alleging discrimination. The rates to be charged for electric power for connections after the date of the sale shall be the applicable rates of Duke Power Company. As used herein the word 'connections' shall be deemed to mean the physical connection of a residence or business establishment and shall have no reference to the person or business firm occupying the premises so connected, and the benefit of the lower rate shall continue although the person or firm occupying such premises may change from time to time.

The rate provisions in Act 1293 departed significantly from the terms of Duke's offer. The definition of "connections", contrary to Duke's usual practice, extended Duke's potential commitment to the special Greenwood rate by removing the possibility of attrition from the class due to changeovers in accounts. Duke agreed, however, to "live with" the alterations to its offer, and accepted the terms of the Act by letter dated March 4, 1966.

Act 1293 was approved by the Governor on March 11, 1966. An intense and highly emotional campaign then ensued in

Greenwood County. The rate provisions of Duke's offer and the Act were emphasized to the voters. In a press release issued shortly before the referendum, a top Duke official stated:

> The law provides that the rates to be charged county electric customers will be whichever is lower, the county rate or the Duke Power rate. We will abide by this law and Duke Power will assist in defending to a successful conclusion any law suit brought by anyone contesting this provision . . .

The referendum was held on April 12, 1966, and voters approved the sale by a margin of 4,909 to 3,211. The PSC approved Duke's application for a certificate of public convenience and necessity and for authority to lease and purchase the Greenwood facilities. Duke then applied for PSC approval of the special Greenwood rates. The PSC issued an order stating, in part:

> . . . WHEREAS, the Act providing for the referendum that authorized the sale of the electric system provided that after the transfer of the properties the lower of the Greenwood County or Duke Power Company rates would be used in billing the customers transferred from Greenwood to Duke.
> NOW, THEREFORE, IT IS ORDERED, ADJUDGED AND DECREED That [the attached Greenwood rate schedules] . . . are approved for billing those customers transferred from Greenwood County so long as bills under these rates are lower than bills under approved Duke Power Company rates . . .

Duke, as a result, billed its Greenwood County customers under a dual rate structure for 15 years. It has transferred Greenwood rate customers to its system-wide rates whenever (1) bills under system-wide rates for a location became less than the Greenwood rates; (2) a location required a new physical connection; and (3) a location's electric demand increased to the point Duke deemed it a "new connection".

By 1981, the Duke rates had become 220% to 350% greater than the old Greenwood rates. Duke ratepayers, even in the same neighborhood, were charged 3 to 3½ times the amount

charged to Duke customers paying the Greenwood rate. Prior to this Action, some Duke ratepayers who had been lawfully transferred to the system-wide rates sued Duke. (Certain members of this class are individual appellants in this Action.) Duke then filed an application with the PSC for increased rates for the 3,283 customers out of an original 9,000 who were still paying the old rate. (Duke serves 15,158 customers in Greenwood County.) The PSC dismissed the application on the basis of Act 1293 of 1966.

Duke then brought this action in circuit court under Code §§ 1-23-380, 15-53-20, and 58-27-2310 for an order declaring that the PSC misconstrued Act 1293 and that the Act violated (1) the equal protection clauses of the U. S. and S. C. Constitutions; (2) Art. III, § 34 of the S. C. Constitution regarding special legislation; and (3) Code § 58-27-840 regarding discriminatory disparity in rates. The circuit court affirmed the PSC order, and we affirm.

## I. CONTRACT INTERPRETATION

Duke first asserts that its contract with the County should not be construed to perpetually freeze the old Greenwood rates and that the PSC retained jurisdiction to alter the contract's terms in the public interest. Code § 58-27-980. We disagree. Section 58-27-980 is overridden in this case by Act 1293. Laws giving specific treatment to a given situation take precedence over general laws on the subject, and later legislation takes precedence over earlier laws. *See South Carolina Electric & Gas Co. v. South Carolina Public Service Authority,* 215 S. C. 193, 54 S. E. (2d) 777 (1949). In addition, the legislature has power to regulate utility rates. Art. IX, § 1, S. C. Constitution. It has delegated certain authority to the PSC, *Bookhart v. Central Electric Power Cooperative, Inc.,* 219 S. C. 414, 65 S. E. (2d) 781 (1951), but the General Assembly can withdraw PSC authority by subsequent acts. *See Clarke v. South Carolina Public Service Authority,* 177 S. C. 427, 181 S. E. 481 (1935). Act 1293 deprived the Commission of jurisdiction to set the original rates, to disturb the sale terms set by the General Assembly, or to determine that the rate differential resulted in unjust discrimination.

Furthermore, the record establises that the parties to the contract did not intend that the Greenwood rates would remain in effect only for a limited time. When Duke entered into the contract, its officials believed that Duke rates would continue to decline rather than increase. Thus, they had no reason to incorporate an end to the effectiveness of the Greenwood rates. Since Duke officials drafted the contract, any ambiguity in its terms must be construed against the company. *Mid-Continent Refrig. Co. v. Way*, 263 S. C. 101, 208 S. E. (2d) 31 (1974). In addition, a party to a contract should not be given relief from the requirements of the contract simply because it proved to be less favorable than an alternative provision would have been. *Bowaters Carolina Corp. v. Carolina Pipeline Co.*, 259 S. C. 500, 193 S. E. (2d) 129 (1972). Here, the language used in the instruments involved can only be understood fairly in one way; the Greenwood ratepayers would have the benefit of the lower of the Duke rate or the Greenwood rate.

Furthermore, Duke's conduct reveals that its own past interpretation of the agreement is consistent with that of the Court. Since 1966, Duke has recognized the dual rate structure in Greenwood County. In its many applications to the PSC for rate increases, Duke has not until the present action applied for a rate increase for the old Greenwood ratepayers.

## II. CONSTITUTIONALITY OF THE SPECIAL LAW (ACT 1293) UNDER S. C. CONSTITUTION, ARTICLE III, § 34.

Duke next contends that Act 1293 is unconstitutional special legislation. We disagree. The court must uphold the constitutionality of legislation if possible, and if its construction is doubtful the doubt will be resolved in favor of the law. *Townsend v. Richland Co.*, 190 S. C. 270, 2 S. E. (2d) 777 (1939).

We adopt the trial court's treatment of this issue, as modified:

"The clear object of the constitutional prohibition of special laws where the general law can be made applicable is to make uniform, where possible; the statutory laws of this State. *Gaud v. Walker*, 214 S. C. 451, 53 S. E. (2d) 316 (1949) ... Recourse to local or special laws often results in a municipality of laws, duplicative or conflicting, on the same subject.

*Sansing v. Cherokee County Tourist Camp Board,* 195 S. C. 7, 10 S. E. (2d) 157 (1940); *Owens v. Smith,* 216 S. C. 382, 58 S. E. (2d) 332 (1950) . . . The allowance of special legislation, where a general law could be made applicable, fosters 'legislation by delegation', which is 'pernicious'. Such legislation 'lacks the settled consideration and consent of the lawmaking body . . . evades statewide responsibility . . . encourages local activity . . . discourages the attrition of minds and the consideration of those problems which make for a wise public policy.' *McElveen v. Stokes,* 240 S. C. 1, 124 S. E. (2d) 592 (1962), citing *Tisdale v. Scarborough,* 99 S. C. 377, 83 S. E. 594 (1914).

The effect of Article III, Section 34 of the South Carolina Constitution is similar to that achieved by the guarantees of equal protection contained in the Constitutions of the United States and of South Carolina. 'It is . . . implicit in both the State and Federal Constitution that legislation may not be discriminatory; that it must give equal protection to all; and that special legislation granting special benefits to private individuals, as contrasted with the public at large, is not permissible'. *Ellison v. Cass,* 241 S. C. 96, 127 S. E. (2d) 206 (1962) . . .

However, not all special or local legislation is prohibited by Article III, Section 34 of the Constitution; special laws are prohibited only where a general law can be made applicable:

> The language of the Constitution which prohibits a special law where a general law can be made applicable, plainly implies that there are or may be cases where a special Act will best meet the exigencies of a particular case, and in no wise be promotive of those evils which result from a general and indiscriminate resort to local and special legislation. There must, however, be a substantial distinction having reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation and the objects and places excluded. The marks of distinction upon which the classification is founded must be such, in the nature of things, as will in some reasonable degree, at least, account for or justify the restriction of the legislation.

*Shillito v. City of Spartanburg,* 214 S. C. 11, 51 S. E. (2d) 95 (1948) . . .

In addition, a major exception to the constitutional prohibition of special acts where a general law can be made applicable is that where the General Assembly has constitutional authority to legislate specifically or directly in a matter, the prohibition of Article III, Section 34, Subsection 9 does not apply. In *City of Columbia v. Smith*, 105 S. C. 348, 89 S. E. 1028 (1916), the Court held:

> It is obvious that subdivision 9 [of Article III, § 34] does not apply to legislation upon those subjects as to which the General Assembly, under the authority of the Constitution, may legislate particularly, even though the same be special in character.

105 S. C. at 357, 89 S. E. 1028. The *City of Columbia* case was concerned with the General Assembly's power to legislate specifically with respect to inferior courts. Our Supreme Court has also upheld legislation, special in form and application, concerned with taxation within the State's counties. *See Anderson et al. v. Page et al*, 208 S. C. 146, 37 S. E. (2d) 289 (1946); *Duke Power Co. v. Bell*, 156 S. C. 299, 152 S. E. 865 (1929) . . .

Duke has argued that if the rate provisions contained in the Act are construed as permanently fixing a ceiling on the rates to be charged by Duke to its customers at certain locations in Greenwood County, the Act, by creating an exception to Public Service Commission jurisdiction to adjust rates, is an impermissibly special or local law where existing general law would otherwise be applicable. Viewed without reference to the special circumstances in Greenwood County, this argument does have appeal; Duke's rates generally are subject to Commission regulation and only certain locations served by Duke in Greenwood County are insulated from Commission adjustment. The class of locations in Greenwood so exempted did result from local legislation, which made no pretense of general application throughout the State.

The crucial issue, however, is: Could the general law (then existing or as it might be fashioned) be appropriately made applicable to the situation presented by the Legislature — the proposed sale of the Greenwood electric system to Duke?

I have concluded that although the rate provision contained in Act 1293 does operate to exempt only a limited class of Duke's customers from rate supervision by the Public Service Commission, the Act does not violate Article III, Section 34 of the South Carolina Constitution. The general laws otherwise governing the regulation of electric rates could not be appropriately applied to the customers once served by Greenwood County Electric Power Commission due to the special circumstances of the sale of the county-owned property to Duke. In addition, since the General Assembly has the power and duty to itself 'provide for appropriate regulation' of public utilities 'as and to the extent required by the public interest' under the terms of Article IX, Section 1 of the South Carolina Constitution, the special Act prohibition of Article III, Section 34 is inapplicable to the General Assembly's exercise of its power to regulate the rates to be charged by Duke in this case.

Prior to its sale to Duke, Greenwood County owned a unique and valuable asset in its electrical system. In addition to the value of the investment, the system provided many other benefits to Greenwood County. The system employed local residents. ... It provided electrical service to approximately 9,000 locations, at rates, for the most part, lower than those available from Duke, a private investor-owned utility, for similar service. All of these benefits taken together enhanced Greenwood County by making it a more prosperous, financially attractive, pleasant place to locate and reside.

The offer by Duke to purchase the Greenwood electric system recognized each of these interests of the County in its system. Duke offered to pay the County a substantial amount of money for the County's interest in the system as an investment. Duke also promised to preserve the water level in the lake, to continue the employment of workers in the Greenwood system, and to maintain or reduce the already low electric rates enjoyed by consumers formerly served by the Greenwood system.

The Greenwood system, being owned by the County, was not subject to regulation by the Public Service Commission. The Greenwood Commission, created by a special Act of the General Assembly, had no power to sell the system. The sale thus required another Act of the General Assembly ...

That a generally applicable law to bind Duke to the terms of its offer could not be fashioned is evident. The Greenwood County situation was unique: it involved the sale of a publicly owned electric system to an investor-owned utility, contingent upon a favorable vote on a public referendum. Even if a law accomplishing the desired result could be framed in general terms, it would, of necessity, be special in application because only in Greenwood County did these conditions exist."

## III. EQUAL PROTECTION

The trial court correctly analyzed the equal protection challenge:

"The (appellants) next argue that the rate differential between the special Greenwood rate and the standard Duke rate deprives Duke's regular ratepayers of equal protection of law. They insist that there is no rational basis for the distinction between locations entitled to the Greenwood rate and other locations served by Duke, both within the County and statewide.

The Equal Protection provisions of both the South Carolina and United States Constitution are concerned with the propriety of classifications and distinction made in the law. It has been noted that:

> All legislation involves classification; from the earliest days classification has been made by legislatures whereby some people have rights or suffer burdens which others do not. Classification is an inherent right and power of the legislature, and the constitutional guaranty of equal protection does not dispense with all classification. A differentiation is not necessarily a discrimination. And since the very idea of classification is inequality, inequality in no manner determines the question of constitutionality.

16A Am. Jur. (2d) *Constitutional law* § 746 (1979).

The approximate standard of review for an Act of the General Assembly such as the one presented here, has been often repeated:

> Unless some suspect criteria, such as race, is involved, it is elementary that the equal protection provisions are

satisfied if the classification bears a reasonable relationship to a legitimate state interest which the Legislature seeks to effect and the constituents of each class are treated alike under similar circumstances and conditions. ... It is no objection that some members of the beneficiary classes will be unable to meet the qualifications, for '[a]n otherwise valid statute of ordinance conferring a privilege is not rendered invalid merely because it chances that particular persons find it hard or even impossible to comply with precedent conditions upon which enjoyment of the privilege is made to depend. 16 Am. Jur. (2d) *Constitutional Law*, § 530 (1964)."

*Bauer v. S. C. State Housing Authority,* 271 S. C. 219, 235-237, 246 S. E. (2d) 869 (1978).

Applying these principles of the law of equal protection, it appears to this Court that the classifications established by Act 1293 do not offend either the South Carolina Constitution or the United States Constitution.

The only classification expressly made by Act 1293's rate provision distinguishes between locations that were served by the Greenwood Commission in 1966 and locations later added to the system after it was acquired by Duke. This classification is rationally related to a legitimate objective of the Act.

As discussed earlier in this Order, the evident purpose of Act 1293 was to enable Greenwood County to sell its electric power system upon terms which preserved and protected, to the extent feasible, the diverse benefits which had accrued to Greenwood County due to its efforts to provide electric service to its population. Among those benefits were reasonably low rates of service for those locations being served by the county-owned system.

It was not unreasonable for the General Assembly to treat those locations actually served by the system when it was owned and developed by Greenwood County differently from those locations added to the system once ownership was transferred to Duke. The first group had actually enjoyed the immediate and direct benefits of County ownership of the system. Their electric service came about as a result of the endeavors of Greenwood County. The latter group, made up of locations not yet connected to the system at the time of the

sale, would secure electric service wholly through the efforts of and at the expense of Duke. Members of this second class would therefore be indistinguishable from Duke's other customers state-wide. The classification of 'existing connections', and the benefit conferred on those locations is not wholly irrelevant to the achievement of a legitimate legislative objective. It is instead rationally related to a purpose of Act 1293: to preserve to the extent feasible the benefits already gained by Greenwood County through its venture into electric power production and distribution.

All members of the class of 'existing connections' are treated equally by Act 1293. Those locations, under the Act, were to be charged the lower of the Greenwood system or the Duke system rates for electric service. Duke's practices over the past fifteen years have resulted in a sub-class of sorts. It appears that once Duke determined that the bill for an 'existing connection' would be less under the Duke rate, that location's account was transferred over to the Duke rate for billing purposes. Once an account was so transferred, Duke never re-examined the bills for that location to determine if the bills would be reduced if the account was re-transferred back to the Greenwood rate. Duke's position is that Act 1293 could not reasonably be construed to require it to continually examine the bills for each location in the special Greenwood class. The propriety of this practice has not been questioned in this lawsuit, and accordingly, this Court passes no judgment on whether Duke's practice in this regard meets the literal requirements of Act 1293. Assuming, without deciding, that this interpretation of the Act is proper, the resulting differential effect within the class of 'existing connections' still does not offend the guaranty of equal protection. The law itself is neutral, and treats all members of the class equally, by giving each 'existing connection' location the benefit of the lower of the two electric rates. Equal protection is not denied merely because there is inequality in the effect of an identical benefit.

Even if the rate provision of Act 1293 permits Duke to continue to charge its higher rates to 'existing connection' locations once transferred from the Greenwood rate, thus in part defeating the Legislature's apparent intent to preserve 'the benefit of the lower rate' for those locations, the result is

not constitutionally objectionable. The classification does not need to completely accomplish the legislative purpose with delicate precision in order to survive a constitutional challenge. . . . It is sufficient if a legitimate legislative objective is furthered by the classification, even if the purpose is not perfectly or completely met by the challenged law.

In any event it appears, and I so find, that the classifications and treatment of the locations served by Duke in Greenwood County are rationally related to the legitimate legislative purpose of preserving to Greenwood County the advantages it had gained by development of its electric system. The rate differential, as allowed by the Act, does not violate the constitutional guaranty of equal protection."

## IV. DISCRIMINATORY RATES UNDER S. C. CODE ANN. § 58-27-840 (1976)

The individual appellants have asserted that the dual rate structure currently in operation is Greenwood County is illegal discrimination. One petitioner, Lewie E. Amick, Jr., testified:

> The reason I am here to testify today is because I think the rates are grossly unfair. They are discriminatory. They create an unreasonable preference to a small group of people. I am very tired of subsidizing my neighbor's electric rates.

In order to have standing to present a case before the courts of this State, a party must have a personal stake in the subject matter of the lawsuit. *Furman University v. Livingston*, 244 S. C. 200, 136 S. E. (2d) 254 (1964).

As the trial court stated:

"This lawsuit is concerned with regulation of the rates which may be charged to Duke's customers presently being served on the old Greenwood rates. The critical issue is whether those rates were fixed by the General Assembly, or whether they may be altered by the Public Service Commission to conform to the generally applicable Duke rates. The individual petitioners have made no claim that they have been irrationally or arbitrarily excluded from the class of 1966 Greenwood ratepayers, or that they too should pay only

the lower rates. Rather, their *only* claim of an interest in the subject of this lawsuit is that the rate differential has resulted in their subsidizing the Greenwood ratepayers, and that the rates should be equalized to relieve them of that burden. The charge of subsidization, crucial to the petitioners' standing, is substantiated by the evidence in this case.

Testimony and evidence produced at trial showed the extent of the rate differential between the special Greenwood rates and the Duke rates, and demonstrated the growth of the difference between the rates since 1966. The regular Duke customers are now paying for electric service under a rate structure approved by the Commission under the conditions of service applicable to them. The rate structure is presumed just and reasonable. Duke's regular customers are now paying exactly the rates Duke is entitled to charge them for electrical service. None of the petitioners produced any evidence to indicate that Duke had attempted to spread the costs of serving its Greenwood rate customers to other South Carolina consumers, or that the Public Service Commission had allowed Duke to do so. No one produced any testimony, or figures presented to the Commission in prior rate increase applications, to demonstrate that Duke included its costs of serving the Greenwood ratepayers in justification of its applications. There was presented no evidence of the basis upon which the Commission approved Duke's prior rate increases over the past eleven years. It is true that Duke had offered to reduce its then pending general rate increase request by the amount eventually allowed in the way of increases against the Greenwood ratepayers. This is no proof of past or potential future subsidization. Duke cannot control the amount of the rate increases allowed by the Commission. This Court has no power to order a reduction of Duke's general rates depending upon the outcome of this litigation. Such a reduction would not automatically occur. This Court notes that Duke made no offer to reduce its actual increase *award*, should that award be less than its requested increase.

It also appears that if the Commission *had* in the past permitted Duke to spread the costs of its service of the Greenwood ratepayers to its other South Carolina customers, that this action would have been improper. Al-

though the South Carolina Supreme Court has yet to be confronted with a situation as is presented in this case, other jurisdictions have developed the rule that such cost spreading is impermissible and that losses must be borne by the company's stockholders.

> If the company has outstanding contracts by which it is failing to recoup the costs involved in delivering service to any customer or class of customers, such contract or rates must not become a burden to the other customers or classes of customers of the company ... [A]ny deficit represented by the difference between what the customer pays and what such customer should have paid will be accounted for and borne by the stockholders of the company in order that there may be no discrimination between customers because of favoritism in rates.

*Re Arkansas Power & Light Co.*, 13 P.U. R. (3d) 1, 23 (Ark. P.S.C. 1956). I consider this to be the correct rule. I will not presume, without proof, that the Commission acted improperly with respect to the Duke rates.

The only ground asserted for the individual petitioners' standing in this case is the alleged reduction they would receive in their service rates if the rate differential in Greenwood County were eliminated, thus ending the petitioners' alleged subsidization of the Greenwood ratepayers. This position assumes, without proof, that the Commission has properly allowed Duke to pass on to its consumers costs arising from an improvident provision in a contract. It also assumes that the Commission would require Duke to pass on possible future increased revenues from Greenwood County to its other customers in the form of rate reductions. It appears to this Court that such an interest is too contingent, hypothetical, and improbable to support standing to attack the constitutionality of a statute or the practices of the Public Service Commission. I therefore find that the individual petitioners lack standing to challenge the rate structure currently in force in Greenwood County.

Duke has likewise argued that the dual rate structure is illegal. The posture assumed by Duke, in challenging the rate provision in Act 1293, is condemned by the concepts of estoppel and waiver.

The greater portion of the language of Act 1293 which states the terms of the proposed sale from Greenwood County to Duke was taken from Duke's written offer to purchase the Greenwood electric system. The adjustments made by the General Assembly to Duke's original offer with respect to rates were expressly accepted by Duke. Duke campaigned for approval of the sale, emphasizing to the Greenwood County voters the binding nature of the rate provision contained in the Act. Duke accepted the benefits of the Act, which enabled its purchase of the Greenwood power system, but would now repudiate a portion of that Act which has proved unfavorable to it. Duke's position comes into conflict with the general rule, which provides:

> A person who in any way procures ... the passage of an act is generally considered as estopped and as not being entitled to question its validity.

16 Am. Jur. (2d), *Constitutional Law*, §§ 207-209 (1979). This general rule has been followed in South Carolina. *See South Carolina & Western Railway v. Ellen*, 95 S. C. 68, 78 S. E. 963 (1913) ...

It must be remembered that Duke professed its commitment to the Greenwood rate provision contained in Act 1293, and intended for Greenwood County voters to rely on its statement concerning the rates to be charged in Greenwood County. Duke has received and retained a substantial benefit, the sale and lease of the Greenwood electric system, as a result of its representations and by operation of Act 1293. Duke specifically accepted the terms of act 1293. I find that Duke is now estopped from challenging the discriminatory effect of the rates."

## V. ATTORNEYS' FEES

We also agree with the trial court's denial of attorneys' fees to the respondents. "The respondents assert they are entitled to an award of counsel fees, to be paid by Duke. They rely on the application of the doctrine of promissory estoppel. They claim that when the principle of promissory estoppel is applied to a press statement, released by Duke on April 8, 1966, in the light of the circumstances then and subsequently existing, it somehow created a contractual obligation of Duke

to pay counsel fees to the respondents. The press statement released by Duke states, in part:

> We will abide by this law and Duke Power will assist in defending to a successful conclusion any law suit brought by anyone contesting this [rate structure] provision.

Ordinarily, an attorney must look to his client for compensation for services performed by his employment. *Caughman v. Caughman*, 247 S. C. 104, 146 S. E. (2d) 93 (1965). Our Supreme Court has clearly defined the occasions when an award of counsel fees may be made.

As a general rule, attorneys' fees are not recoverable unless authorized by contract or statute.

It is clear that an award of counsel fees to respondents is not authorized by any statute germane to this case. The next inquiry, then, is whether an award of counsel fees to respondents can be granted based on a contract.

The respondents rely upon the application of the doctrine of promissory estoppel defined and approved by our Supreme Court in *Higgins Construction Co. v. Southern Bell Telephone and Telegraph Co.*, 276 S. C. 663, 281 S. E. (2d) 469 (1981). This doctrine declares:

> An estoppel may arise from the making of a promise, even though without consideration, if it was intended that the promise should be relied upon, and in fact it was relied upon, and if a refusal to enforce it would be virtually to sanction the perpetration of fraud or would result in other injustice.

281 S. E. (2d) at 470, citing 28 Am. Jur. (2d) *Estoppel and Waiver*, § 48 (1966). This argument by the respondents presupposes that promissory estoppel, even if proved, is sufficient to support an award of counsel fees; that is, promissory estoppel is the legal equivalent of a contract. I disagree with this analysis.

The principle of promissory estoppel is viewed as a substitute for, or an equivalent of, consideration. The basis of the doctrine is not so much one of contract, with a substitute for consideration, but an application of the

general principles of estoppel under appropriate circumstances. 28 Am. Jur. (2d) *Estoppel and Waiver*, § 48 (1966). The circumstances which may trigger the application of promissory estoppel in this case cannot be tortured into the requisite elements of a traditional contract. A contract and promissory estoppel are two different creatures of the law; they are not legally synonymous; the birth of one does not spawn the other.

Duke has never contracted to pay the respondents' counsel fees.

I have been unable to find any legal authority in this State approving an award of counsel fees based upon the doctrine of promissory estoppel, and none have been cited by the respondents. The Supreme Court of our State, as noted, has limited the award of counsel fees only to those occasions which are authorized by statute or contract. Neither of these underlying authorizations are present here.

The claim for an award of attorneys' fees by respondents is denied."

## CONCLUSION

In summary, we interpret the contract between Duke and Greenwood County to provide that old Greenwood ratepayers shall pay the lower of the 1966 Greenwood rate or the Duke system-wide rates. Act 1293, the special legislation relating to the transaction, overrides Code § 58-27-980 and deprives the PSC of jurisdiction to modify the contract. Act 1293 is constitutional special legislation and does not deny ratepayers transferred to the Duke system equal protection of the law.

The individual appellants lack standing to raise the disparity in rates because the evidence does not reveal that they are subsidizing the old Greenwood customers' rates, and Duke is estopped to assert that the contractual arrangement has resulted in a discriminatory rate system.

We note that the class of old Greenwood ratepayers has decreased by two-thirds since 1966 due to customers being transferred to the Duke system. In addition, a 200% increase in Greenwood rates would result in only a .45% decrease in Duke rates. Also, there was no showing that Duke actually loses money as a result of the low Greenwood rates. As a

matter of fact, Duke is enjoying the benefits of its forty-year lease with the County and its purchase of the facilities at 1966 prices. Nevertheless, we remind the Company that if it is suffering a loss the shareholders must bear it, and it must not be passed on to other ratepayers.

The judgment below is, accordingly,

Affirmed.

NESS, J., and WILLIAM L. RHODES, JR., as Acting Associate Justice, concur.

GREGORY, Justice (dissenting):

I would hold that the Public Service Commission did have jurisdiction to inquire into and about the Greenwood facility to determine the fairness of the differing rates.

The Commission has broad powers to regulate public utilities in South Carolina. S. C. Code Ann. § 58-27-140 (1976). These powers encompass the power to ". . . [a]scertain and fix just and reasonable standards, classifications, regulations, practices or service to be furnished, imposed, observed and followed by any and all electrical utilities." Section 58-27-140(1).

The Commission's power to investigate and change rates is set forth in S. C. Code Ann. § 58-27-850 (1976):

> Whenever the Commission after a hearing, upon its own motion or upon complaint, finds that the existing rates ... for any service ... *are unjust, unreasonable, insufficient, unreasonably discriminatory* ... the Commission shall determine the just, reasonable, and sufficient rates to be thereafter observed and in force and shall fix the same by its order. (emphasis added.)

The Commission declined to act in this matter because Act 1293 of 1966. In my view, the Commission had authority to inquire into the sufficiency and fairness of the rate.

Although it is doubtful the scheme set forth in the 1966 Act could be anything but unfair, I do not decide this issue and, indeed, it is impossible to make such an inquiry because the Commission never reached the merits of the application. Instead, the Commission ruled it lacked jurisdiction because of the Act.

Therefore, I would remand for full consideration by the Public Service Commission. Any other holding seriously dilutes the powers granted to the Commission by the legislature, allowing those powers to be contracted out of regulatory control.

Reversed and remanded.

LITTLEJOHN, Chief Justice (dissenting):

I am in general agreement with the dissent of Justice Gregory. I would, however, elaborate upon the position he takes.

I agree with the contention of view that subsection 3 of section 4 of Act 1293 of 1966 violates the equal protection of the law clause of Article 1, Section 3 of the Constitution of South Carolina and of the Fourteenth Amendment of the Constitution of the United States.

By this provision of the act, the Legislature has undertaken to give sanction and validity to the contract entered into between Duke Power Company and Greenwood County. It is inescapable that to some degree other Duke Power consumers are subsidizing Greenwood County consumers protected by the act and contract. Both of these principle litigants are different from most parties to an action in that their right to contract is circumscribed and must be consistent with the public interest.

This contract has been in effect and honored for some eighteen years. Equal protection has been denied during this entire period. There is no limit in point of time in the contract; and unless this Court intervenes, the inequity will carry on *ad infinitum.* In my view, no governmental entity, including utilities, has a right to bind those for whom it speaks by way of contract or otherwise for a time unlimited.

Duke would have the Court invalidate that part of the contract obnoxious to it while retaining that part of the contract obviously beneficial. Duke submits that the contract is severable. I disagree. A part of the consideration which Duke promised Greenwood County, and in turn the consumer involved, was that the rate would never be greater than the rate consumers were momentarily paying. It would be grossly unfair to allow Duke to keep all of the properties it

received without paying all of the consideration it promised. And this is especially true since Duke may not discriminate between its consumers.

No doubt the facilities have been greatly altered and improved. There is no such thing as an equitable swap back. Perhaps the best of the bad solutions available would be for a court of equity to relieve Duke of its obligation to supply power to Greenwood consumers at the old rate and simultaneously require Duke to make adjustments in some equitable way.

I would reverse and remand.