## 23396

Lota G. PAYNE, Dewayne O. Looper, Cambridge House of Furniture, Inc., and Douglas A. Hayes, Jack Mangum and Clair M. Mangum, William O. Noffz, Odell Cohen, W. Jones Hodges, Herbert E. Keadle and Frances S. Keadle, Marion Hitt, Durst A. Loftin, Bernice R. Horne, and James A. McQuown, M.D., Individually and on Behalf of All Others Similarly Situated, as a Class, Appellants v. DUKE POWER COMPANY and Greenwood County, Respondents.

(405 S.E. (2d) 399)

Supreme Court

*J. Kendall Few*, Greenville, *William W. Griffith* and *Marvin R. Watson*, Greenwood, *for appellants.*

*Donald L. Ferguson, Watson L. Dorn*, Greenwood, and *Steve C. Griffith, Jr.*, Charlotte, N.C., *for respondent Duke Power Co.*

*Howard L. Burns*, Greenwood, *for respondent Greenwood County.*

Heard March 19, 1991.

Decided May 6, 1991.

CHANDLER, Justice:

This class action against Duke Power Company (Duke) and Greenwood County (County) was commenced by certain Duke customers (Customers) who contend Duke violated the contract under which it purchased an electric power system from the County. Customers appeal judgment in favor of Duke and the County.

We affirm.

## FACTS[1]

Prior to the sale to Duke, County, through the Greenwood County Electric Power Commission (Greenwood), provided retail electric service to more than 9,000 customers. On May 10, 1965, Greenwood and Duke representatives met to discuss the possibility of Duke's purchasing the system. From an understanding reached at this meeting, Duke tendered a written offer to purchase.

In response to Duke's offer, the General Assembly enacted Act No. 1293 of 1966,[2] which authorized the sale, provided it be approved by a majority of Greenwood County voters in a referendum. The Act further provided:

---

[1] Many of these facts are recounted in *Duke Power Co. v. South Carolina Public Service Commission*, 284 S.C. 81, 326 S.E. (2d) 395 (1985).

[2] 1966 S.C. Acts 3294.

> *The rates to be charged for electric power for all connections which exist at the consummation of the sale shall be the lower of the rates charged by the Greenwood County Electric Power Commission and Duke Power Company* and the same shall not be grounds for any claim alleging discrimination. *The rates to be charged for electric power for connections after the date of the sale shall be the applicable rates of Duke Power Company.* As used herein the word "connections" shall be deemed to mean the physical connection of a resident or business establishment and shall have no reference to the person or business firm occupying the premises so connected, and the benefit of the lower rate shall continue although the person or firm occupying such premises may change from time to time. [Emphasis supplied.]

On March 4, 1966, Duke accepted the terms of Act 1293, including modifications to its original offer. Upon approval by the voters, and after authorization was obtained from the South Carolina Public Service Commission (PSC) and the Federal Power Commission, the sale was consummated on July 1, 1966.

Thereafter, Duke filed the Greenwood rate schedules with PSC, which approved the Greenwood rates "so long as bills under these rates are lower than bills under approved Duke Power Company rates. . . ." Duke's system for comparing rates was described in a letter sent to all former Greenwood customers. The letter, copy of which was included in the PSC filing, stated in part:

> After the proper Duke rate has been determined, the electric bill for your location will be computed for the twelve months preceding July 1, 1966, on both the Duke and Greenwood rates.
>
> *If the Duke rate is lower, you will be billed on the Duke rate for all future billing at that location,* and you will be given a credit for any difference between the two rates rendered since the first of July. In all probability, this will occur within two or three months.
>
> If your bill is lower on the Greenwood rate, you will continue to be billed on the Greenwood rate at your location.

Every month a comparison will be made and when the 12 months bill becomes lower on the Duke rate, billing will be changed to the Duke rate. Therefore, it will not be necessary that you request a change to the lower rate. [Emphasis supplied.]

Duke began implementation of the "systematic monthly bill comparison" in October, 1966. Although at the time of sale it was anticipated that rates would continue their downward trend,[3] Duke, in 1971, was granted the first of several rate-increases.[4] This effectively ended the need for comparing bills, and Duke discontinued the practice shortly thereafter. In the meantime, over 4,000 customers were transferred to the Duke rates.

Customers were also transferred upon a change either in the character of the connection, for example an upgrade from single-phase to three-phase service, or in the type of use, for example, from residential to commercial. Duke deemed these changes as constituting "new connections" to which the Duke rates applied. These changes have resulted in the transfer of approximately 600 customers.[5]

On March 17, 1980, Customers commenced this class action for declaratory, monetary, and injunctive relief. Shortly thereafter, Duke applied to PSC for transfer of *all* former Greenwood customers to the Duke rates. PSC's denial of the application precipitated court action by Duke, culminating in this Court's opinion upholding the constitutionality of Act 1293 and interpreting it so as to prohibit PSC from increasing the old Greenwood rates. *See Duke Power Co., v. South Carolina Pub. Serv. Comm'n*, 284 S.C. 81, 326 S.E. (2d) 395 (1985).

Customers' class action, which had been removed from the calendar, was restored. It proceeded to trial before the court without a jury, resulting in judgment for Duke and the County.

---

[3] In fact, a survey issued by the Federal Power Commission in 1964 projected constantly declining rates nationwide well into the 1970s.

[4] Today, Duke rates are nearly five times the old Greenwood rates.

[5] Some former Greenwood customers were transferred to the City of Greenwood's electric system upon annexation. Several service locations have ceased to exist. More than 3,000 customers remain under the old Greenwood rate schedules.

## ISSUE

The sole issue we address is whether Duke breached the contract of purchase.

## DISCUSSION

The Amended Complaint establishes three subclasses of customer-plaintiffs:

(a) those transferred to the Duke rates as a result of the systematic monthly bill comparison;

(b) those transferred to the Duke rates as a result of change in the character of connection; and

(c) those transferred to the Duke rates as a result of change in use of the premises from residential to commercial.

Customers in subclass (a) contend the contract imposed a continuing duty upon Duke to retransfer customers back to the Greenwood rates once the Duke rates became higher than Greenwood's. Trial court held that retransfer was not required. We agree.

As embodied in Act 1293, the contract, while expressly mandating the lower of the two rates, is silent regarding retransfer. Accordingly, parole evidence was properly considered. *Soulios v. Mills Novelty Co.*, 198 S.C. 355, 17 S.E. (2d) 869 (1941). We hold the trial court correctly construed the contract.

First, it was the understanding of all parties involved in negotiating and implementing terms of the sale, that transfers to Duke rates, once made, would be permanent. The construction placed upon a contract by the parties themselves, if not determinative, is entitled to great weight. *Kitchens v. Lee*, 221 S.C. 59, 69 S.E. (2d) 67 (1952); *Stackhouse v. Pure Oil Co.*, 176 S.C. 318, 180 S.E. 188 (1935).

Second, PSC, the agency charged with administering Act 1293,[6] has, without exception, construed it as establishing a closed rate schedule, that is, one precluding retransfer of cus-

---

[6] Although in *Duke Power v. Public Service Commission, supra*, this Court held that Act 1293 divested PSC of jurisdiction to raise the old Greenwood rates, PSC is not prohibited from exercising its regulatory authority in a manner consistent with the Act.

tomers. Where an administrative agency has consistently over time applied a statute in a particular way, its construction should not be overturned absent cogent reasons. *See Emerson Elec. Co. v. Wasson*, 287 S.C. 394, 339 S.E. (2d) 118 (1986); *Bunch v. Cobb*, 273 S.C. 445, 257 S.E. (2d) 225 (1979); *Etiwan Fertilizer Co. v. South Carolina Tax Comm'n*, 217 S.C. 354, 60 S.E. (2d) 682 (1950).

Finally, use of a closed rate schedule in mergers such as here comports with industry practice. Indeed, an expert witness testified that Customers' interpretation would bring about an unprecedented result.

With reference to customers in subclasses (b) and (c), we agree with the trial court that a change in either the character of the connection (e.g. from single to three phase) or use of the premises (e.g. from residential to commercial) constitutes a new connection effectuating a transfer to Duke rates. As stated in the contract, "[t]he rates to be charged . . . for connections *after* the date of the sale shall be the applicable rates of Duke Power Company."

Plaintiffs' remaining exceptions are dismissed pursuant to Supreme Court Rule 23. *See Burris v. Electro Motive Mfg. Co.*, 247 S.C. 579, 148 S.E. (2d) 687 (1966) (statute of limitations and laches); *In re Lyde*, 284 S.C. 419, 327 S.E. (2d) 70 (1985) (mandamus); *Beck v. Northwestern R.R. Co.*, 99 S.C. 310, 83 S.E. 335 (1914) (admission of affidavits); *Marsh Plywood Corp. v. South Carolina State Highway Dep't*, 258 S.C. 119, 187 S.E. (2d) 515 (1972) (admission of prior testimony).

Affirmed.

HARWELL, A.C.J., FINNEY and TOAL, JJ., and C. TOLBERT GOOLSBY, Jr., Acting Associate Justice, concur.