# THE STATE OF SOUTH CAROLINA
## In The Supreme Court

Jennifer Pinckney, Howard Duvall, and Kay Patterson, Petitioners,

v.

Harvey Peeler, in his official capacity as President of the South Carolina Senate; and James H. Lucas, in his official capacity as Speaker of the South Carolina House of Representatives, Respondents.

Appellate Case No. 2020-000970

―――――――――

## ORIGINAL JURISDICTION

―――――――――

Opinion No. 28062
Heard May 25, 2021 – Filed September 22, 2021

―――――――――

## DECLARATORY JUDGMENT ISSUED

―――――――――

Matthew Terry Richardson, Wyche Law Firm, of Columbia; Gerald Malloy, Malloy Law Firm, of Hartsville, both for Petitioners.

Kenneth M. Moffitt and Patrick Graham Dennis, both of Columbia, for Respondent Harvey S. Peeler.

James Keith Gilliam, of Greenville; Bradley Scott Wright, of Columbia, both of Burr & Forman LLP, for Respondent James H. Lucas.

Attorney General Alan McCrory Wilson, Solicitor General Robert D. Cook, and Deputy Solicitor General J. Emory Smith Jr., all of Columbia, for Amicus Curiae South Carolina Attorney General.

Robert K. Merting, R. K. Merting, LLC, of Greenville, for Amici Curiae The South Carolina Division Sons of Confederate Veterans, Inc.; Department of Georgia and South Carolina, Sons of Union Veterans of the Civil War; The Washington Light Infantry of Charleston, SC 1807; Palmetto Guard of Charleston; South Carolina Division of the United Daughters of the Confederacy; Sons of Union Veterans of the Civil War; Sons of Confederate Veterans, Inc.; American Heritage Association; and The South Carolina History Preservation Committee, Inc.

---

**JUSTICE FEW:** Petitioners Jennifer Pinckney, Howard Duvall, and Kay Patterson filed a complaint in this Court seeking a declaration that section 10-1-165 of the South Carolina Code (2011) violates the South Carolina Constitution in three respects. Petitioners also seek an injunction prohibiting enforcement of section 10-1-165. We granted the petition to hear the case in our original jurisdiction. We find unconstitutional the procedural provision in subsection 10-1-165(B) purporting to restrict the General Assembly's legislative power by imposing a supermajority voting requirement to amend or repeal section 10-1-165. We find no constitutional violation in the substantive provisions in subsection 10-1-165(A) preventing the relocation, removal, renaming, or rededication of monuments, memorials, streets, bridges, parks, or other structures. We deny the request for an injunction.

## I.    The Heritage Act

Our General Assembly enacted section 10-1-165 in 2000 as part of Act 292. Act No. 292, 2000 S.C. Acts 2069, 2071-72. Act 292 is commonly referred to as the South Carolina Heritage Act.[1] The passage of the Heritage Act followed decades of

---

[1] In previous Legislative Sessions, similar proposed bills were titled "Heritage Act." *See, e.g.*, S. Journal, 112th Leg. Sess. at 650 (S.C. Feb. 19, 1997) (containing Senate Bill 390, entitled "A BILL . . . TO ENACT THE 'SOUTH CAROLINA HERITAGE ACT OF 1997'"). Act 292 of 2000 originated without a title in the Senate as Senate Bill 1266. S. Journal, 113th Leg. Sess. at 1388-89 (S.C. Mar. 21, 2000). The House

public controversy centered on attempts to remove the Confederate flag from atop the dome of the South Carolina State House in Columbia. By late 1999, as many anticipated the removal of the flag would be a major issue in the 2000 Legislative Session, the controversy reached a fevered pitch. One Senator who demanded removing the flag entirely from the Capitol grounds stated, "We've entered a warlike atmosphere. . . . And once you enter a war, people who were once friends and allies find themselves on opposite sides."[2] "Yes, I'm frustrated," the same Senator added, "I'm angry."[3] Another Senator who demanded the flag remain on the dome remarked that "the state stood at the brink of a racial 'abyss' over the flag."[4]

"No other issue in recent state history was as emotionally charged as the question of the flying of the Confederate battle flag," wrote a prominent University of South Carolina history professor. Walter Edgar, SOUTH CAROLINA: A HISTORY 568 (1998); *see also* W. Scott Poole, *Confederate flag controversy*, THE SOUTH CAROLINA ENCYCLOPEDIA (2006) (stating "the presence of the flag above the Palmetto State's legislative seat would become an enduring public controversy in the 1980s and 1990s"). In May 2000, just before the House finally passed the Heritage Act, one of the only three members of the General Assembly still in office after voting to put the flag on the dome in 1962 observed, "I have never seen another debate as emotional as this one." K. Michael Prince, RALLY 'ROUND THE FLAG, BOYS! SOUTH CAROLINA AND THE CONFEDERATE FLAG 243 (2004).

The controversy over display of a Confederate flag at the State House began in 1956 when the South Carolina Senate adopted a resolution entitled, "The draping of the Battle Flag of the Southern Confederacy in the Chamber of the Senate." S. 749, S.

---

of Representatives added the title "South Carolina Heritage Act of 2000" to the bill as an amendment. H.R. Journal, 113th Leg. Sess. at 4028-45 (S.C. May 10, 2000). The Senate did not adopt the title, and the title does not appear anywhere in the final version of the Act. Nevertheless, we will refer to Act 292 of 2000 as the Heritage Act.

[2] *See* Lee Bandy, *Sick of talking, Jackson goes to 'war' against the flag*, THE STATE (Dec. 26, 1999).

[3] *Id.*

[4] *See* Tim Smith, *Flag debate disrupts monument meeting*, THE GREENVILLE NEWS (Dec. 15, 1999).

Journal, 91st Leg. Sess. at 1184-85 (S.C. Apr. 10, 1956).  According to a 1993 opinion of our Attorney General, S.C. Atty. Gen. Op. No. 93-69 (Oct. 18, 1993), the Senate adopted the resolution in response to the Supreme Court's 1954 decision in *Brown v. Board of Education of Topeka, Shawnee County, Kansas*, 347 U.S. 483, 74 S. Ct. 686, 98 L. Ed. 873 (1954).  It is not insignificant that *Brown* reversed the decision of a three-judge panel upholding school segregation in South Carolina, *Briggs v. Elliott*, 98 F. Supp. 529 (E.D.S.C. 1951), and required the State of South Carolina to integrate its public schools.  As a former Chief Justice of this Court understated it, "I cannot say that people received the Supreme Court ruling gleefully."  Bruce Littlejohn, LITTLEJOHN'S POLITICAL MEMOIRS (1934-1988) 175 (1989).  Professor Edgar was more direct, "Shock, disbelief, anger, rage—any of these words could have been used to describe the reaction of most white Carolinians to the decision."  Edgar, *supra*, at 524.  Travis Medlock—then-Attorney General of South Carolina—put it forcefully, "The Battle Flag['s] . . . placement there in 1956 was clearly an act of defiance which was typical of the South's reaction at the time."  Atty. Gen. Op. 93-69.  To many South Carolinians, the Confederate flag—soon to fly on the State House dome—became a symbol of this defiant rage.  *See* Rick Bragg, *Time to Lower Rebel Flag, A Southern Governor Says*, N.Y. TIMES (Nov. 27, 1996) ("[The flag] has been a divisive symbol since it was raised in 1962, not only in remembrance of the Civil War but more so to show the state's resistance to the civil rights movement.").[5]

In 1959, the General Assembly created the South Carolina Confederate War Centennial Commission.  Act No. 313, 1959 S.C. Acts 587.  In 1962, the Commission chair introduced—and both houses of the General Assembly passed—a Concurrent Resolution "requesting [a division director] to have the Confederate Flag flown on the flagpole on top of the State House."  H. Con. Res. 2261, H.R. Journal, 94th Leg. Sess. at 458 (S.C. Feb. 14, 1962); H. Con. Res. 2261, S. Journal,

---

[5] *See also* Richard L. Beasley, *Flag has become symbol of racism and should come down*, THE STATE (Dec. 12, 1996) ("Instead of the flag standing for our heritage, it has now begun to stand as a symbol for racist views.").  Richard L. "Dick" Beasley was a member of the South Carolina House of Representatives from 1961 to 1966.  Legis. Manual 81 (S.C. 1966).  As his editorial in The State indicates, he voted to put the flag on the State House dome in 1962.  As his editorial also indicates, Mr. Beasley later recognized the flag was not merely a symbol of celebration, as some authorities discussed in this opinion contend.  He wrote, "I believe our people need to do as I have and admit to themselves that heritage was a smokescreen to cover how they really felt."  Beasley, *supra*.

94th Leg. Sess. at 721 (S.C. Mar. 15, 1962).[6]  Apparently because the 1962 Concurrent Resolution did not have the force of law, Atty. Gen. Op. (June 17, 1987), there was confusion over who had the authority to remove the flag from the State House dome, Atty. Gen. Op. 93-69.  The General Assembly ended that confusion in 1995 by requiring that any permanent change in the location of the flag be approved by the Legislature.  Act No. 145, 1995 S.C. Acts 900, 1473.[7]

In the early 1990s, the NAACP led a national boycott of South Carolina because of the State's flying of the flag.[8]  As a result, "business leaders became involved, in part, because of fear that the flag's presence on the Capitol dome will hurt efforts to draw new industry and jobs to South Carolina."[9]  In 1994, the Senate approved a compromise that would remove the flag from the dome of the State House and place it "at the Confederate Soldier's Monument."  S. Journal, 110th Leg. Sess. at 5587-89 (S.C. June 1, 1994).  Governor Carroll Campbell supported the compromise, Edgar, *supra*, at 569, but it failed in the House.  In 1996, Governor David Beasley "took a strong stand in favor of removing the flag from the dome and placing it on a pole on

---

[6] *See also* Atty. Gen. Op. 93-69 (discussing the Concurrent Resolution); S.C. Atty. Gen. Op. No. [unnumbered] (June 17, 1987) (same).  The unnumbered opinion may be found at https://www.scag.gov/wp-content/uploads/2014/07/87june17courson-00149422xD2C78.pdf (last visited Aug. 26, 2021).

[7] The 1995 provision was enacted in contemplation of the upcoming renovations to the State House and applied to "All portraits, flags, banners, monuments, statues, and plaques which were in or on the State House on May 1, 1995."  The General Assembly amended the provision in 1997 to permit the respective chambers to make changes within the chamber but to provide, "The location of all . . . flags . . . located outside of the respective chambers must not be changed unless approved by an act passed by the General Assembly."  Act No. 110, 1997 S.C. Acts 515, 516.  The amended provision is now codified at subsection 10-1-163(A) of the South Carolina Code (Supp. 2020).

[8] John Monk, *Long road to remove SC's State House Confederate flag was gut-wrenching, not easy*, THE STATE (July 10, 2020).

[9] Nina Brook & Cindi Ross Scoppe, *Campbell could call for flag session soon*, THE STATE (June 25, 1994).

the State House grounds near the Confederate Soldier Monument."[10]  Many political observers believe Governor Beasley's attempt to remove the flag from the State House dome was a major factor in his unsuccessful re-election bid in 1998.[11]

In 2000, Governor Jim Hodges made his own forceful challenge to remove the flag when he delivered his "State of the State" speech to a Joint Session of the General Assembly on January 19,

> Finally tonight, I believe that each of us must accept the challenge to open our hearts to reconciliation.  There are some steps long overdue for our state that we must take now. . . .  The Confederate flag that flies above this State House is hardening the hearts of some of our fellow South Carolinians.  On both sides, voices have been raised, tempers have flared and many have been tempted to dig in their heels.  Let me tell you what I believe. . . .  [W]e must move ahead and find a resolution to this debate. . . .  Let's resolve this issue.  And let's resolve it now.  We must move the flag from the dome to a place of historical significance on the State House grounds.  The debate over the Confederate flag has claimed too much of our time and energy—energy that can be put to better use building schools, improving health care and recruiting jobs. . . .

---

[10] Charles Joyner, *Furling that banner: The rise and fall of the Confederate flag in South Carolina, 1961-2000*, THE STATE (July 9, 2015).  Professor Joyner's essay is also published at, Charles Joyner, *Furling That Banner: The Rise and Fall of the Confederate Flag in South Carolina, 1961-2000, in* CITIZEN SCHOLAR: ESSAYS IN HONOR OF WALTER EDGAR 21 (2016).  *See also Debating the flag: 3 views*, THE STATE (Dec. 1, 1996) (publishing remarks by Governor Beasley).

[11] *See* Joyner, *supra* note 10; *Award Recipient: David Beasley*, *Remarks by Senator Edward M. Kennedy*, JOHN F. KENNEDY PRESIDENTIAL LIBRARY AND MUSEUM, https://www.jfklibrary.org/events-and-awards/profile-in-courage-award/award-recipients/david-beasley-2003 (last visited Aug. 26, 2021).  Former Governor Beasley joked to reporters during a March 2000 "march" to the Capitol with Mayor Joe Riley of Charleston to support removing the flag from the Capitol dome that he was "the last living casualty of the Civil War."  John Monk, *Beasley says he's doing right thing*, THE STATE (Apr. 8, 2000).

> Yes, let us reach an agreement this year to move the flag. . . . I challenge you to join me in our progress toward a new South Carolina for this new century. A South Carolina no longer troubled by long-running conflicts over the Confederate flag.

H.R. Journal, 113th Leg. Sess. at 642-43 (S.C. Jan. 19, 2000).

By the end of the 2000 Legislative Session, the General Assembly reached the compromise long hoped for and, on May 23, enacted the Heritage Act.[12]  Governor Hodges signed the Heritage Act into law the same day.  2000 S.C. Acts at 2072.

The primary purpose of the Heritage Act was to remove the Confederate flag from the dome of the State House.  Section 1 of the Act achieved that purpose, providing, "As of 12:00 noon on the effective date . . . , and permanently thereafter, the only flags authorized to be flown atop the dome of the State House, in the chambers of the Senate and House of Representatives . . . are the United States Flag and the South Carolina Flag."  *See* S.C. Code Ann. § 1-10-10 (2005) (codifying Section 1 of the Heritage Act).

However, Section 1—the primary purpose—would not pass without a compromise, so the General Assembly included Section 3, later codified as section 10-1-165, which provides,

> (A) No Revolutionary War, War of 1812, Mexican War, War Between the States, Spanish-American War, World War I, World War II, Korean War, Vietnam War, Persian Gulf War, Native American, or African-American History monuments or memorials erected on public property of the State or any of its political subdivisions may be relocated, removed, disturbed, or altered.  No street, bridge, structure, park, preserve, reserve, or other public area of the State or any of its political subdivisions dedicated in memory of or named for any historic figure or historic event may be renamed or rededicated.  No person may prevent the public body responsible for the monument or

---

[12] For a serious and thoroughly-researched account of the negotiations in the 2000 Legislative Session leading to the compromise of the Heritage Act, *see* Prince, *supra*, at 211-47.

memorial from taking proper measures and exercising proper means for the protection, preservation, and care of these monuments, memorials, or nameplates.

(B) The provisions of this section may only be amended or repealed upon passage of an act which has received a two-thirds vote on the third reading of the bill in each branch of the General Assembly.

## II.     Summary of the Challenge

The Petitioners[13] challenge the constitutionality of subsection 10-1-165(A)—the substantive portion of the statute—on several grounds and subsection 10-1-165(B)—the procedural supermajority voting requirement—on a separate ground. As to subsection 10-1-165(A), the Petitioners argue the statute violates the constitutional prohibition on special laws and the constitution's "Home Rule" provisions. *See* S.C. Const. art. III, § 34 (entitled, "Special laws prohibited"); S.C. Const. art. VIII, § 7 (entitled, "Organization, powers, and duties of counties; special laws prohibited," commonly referred to as "Home Rule"). We address those arguments in Sections V.A. and V.B. below. As to subsection 10-1-165(B), the Petitioners argue the supermajority voting requirement unconstitutionally restricts the Legislature's ability to amend or repeal the statute. We address this argument in Section III.B and find it does. In Section IV, we address whether our finding the supermajority requirement is unconstitutional requires us to "declare the Heritage Act is unconstitutional in its entirety and permanently enjoin its enforcement," as the Petitioners say they request, or requires us to prevent the enforcement of subsection 10-1-165(A), which is what the Petitioners actually want; or, whether subsection 10-1-165(B) may be severed from the remainder of the Heritage Act, leaving section 1-10-10 and subsection 10-1-165(A) to be enforced as written.

---

[13] Jennifer Pinckney is the wife of the late Reverend and South Carolina Senator Clementa Pinckney. Senator Pinckney was murdered at Mother Emanuel African Methodist Episcopal Church in Charleston in 2015. Monuments and memorials located throughout the State are dedicated to the life and tragic death of Senator Pinckney. Howard Duvall is former Councilman and Mayor in the Town of Cheraw. He now serves as an elected member of the City Council of Columbia and as a member of the Columbia Arts and Historic Preservation Committee. Kay Patterson was a member of the South Carolina House of Representatives (1975-85) and Senate (1985-2008) and has a historical marker dedicated to him.

### III.    Supermajority Requirement

The Petitioners contend subsection 10-1-165(B) unconstitutionally restricts the General Assembly's legislative power by imposing a supermajority voting requirement to amend or repeal the statute.  We agree.

### A.    Ripeness

As an initial matter, the Respondents argue the Petitioners' challenge to the supermajority requirement is not ripe for the Court's review because the General Assembly has not voted on any attempt to amend or repeal subsection 10-1-165(A) since its enactment in 2000.  The Respondents argue that if the General Assembly never attempts to amend or repeal the subsection, then whether the supermajority requirement is constitutional may never become an issue.  We disagree.  The supermajority voting requirement in this subsection has significant potential to dissuade members of the General Assembly from attempting to amend or repeal section 10-1-165.  Typically, a member of the House of Representatives or the Senate will gauge his or her chances for success before proposing legislation.  "Politics is the art of the possible," as many have observed.  The supermajority voting requirement is an obstacle to the possibility that those seeking to amend or repeal section 10-1-165 might actually attempt to do so.  We find the Petitioners' challenge to subsection 10-1-165(B) is ripe.

### B.    Constitutionality of the Supermajority Voting Requirement

The Petitioners argue the Constitution of South Carolina permits the General Assembly to act—to enact, amend, or repeal legislation—by only a majority vote, so long as a quorum is present, unless the constitution provides otherwise.  We agree.[14]

---

[14] We have stated that "absent a constitutional provision to the contrary, the legislature acts and conducts business through majority vote." *Bd. of Trs. of Sch. Dist. of Fairfield Cnty. v. State*, 395 S.C. 276, 279, 718 S.E.2d 210, 211 (2011).  The issue before the Court in that case, however, was different from the issue in this case.  The question there was whether the House of Representatives or the Senate may override a Governor's veto by a two-thirds vote of members voting, or whether the constitution required a two-thirds vote of all members present.  *Id.*  This Court has not addressed the specific question before us in this case.

We begin our analysis of this question with the fundamental, firmly-established principle that "in the General Assembly rests plenary legislative power, limited only by the constitutions, State and Federal. Legislation not expressly or impliedly inhibited by one or the other of these documents may be validly enacted." *Ashmore v. Greater Greenville Sewer Dist.*, 211 S.C. 77, 96, 44 S.E.2d 88, 97 (1947).[15] The word "plenary" means, "Full, entire, complete, absolute, . . . unqualified." *Plenary*, BLACK'S LAW DICTIONARY (5th. ed. 1979). Thus, "plenary legislative power" includes the power to amend or repeal legislation. Therefore, there can be no limit on the General Assembly's power to enact, amend, or repeal legislation unless the limit is set forth in the state or federal constitution.

As we stated, this Court has not specifically addressed whether one legislature can restrict a future legislature's authority to enact, amend, or repeal legislation. *See supra* note 14. However, this issue has arisen before in South Carolina. In 1885, the General Assembly of this State enacted "An Act to Prescribe and Regulate the Introduction in the General Assembly of Measures Related to Private Interests . . . ." Act No. 165, 1885 S.C. Acts 309. The effect of the legislation was that "no Bill . . . for the granting of any privilege, immunity, or for any other private purpose whatsoever" could be introduced in or enacted by the General Assembly "except by petition, to be signed . . . by the person or persons seeking such privilege, immunity or other private grant or relief." *Id.*; *see also* Rev. Stat. of S.C. § 31 (1893). In other words, the 1885 General Assembly restricted the power of future General Assemblies to enact legislation.

---

[15] *See also Hampton v. Haley*, 403 S.C. 395, 403, 743 S.E.2d 258, 262 (2013) ("[T]he General Assembly has plenary power over all legislative matters unless limited by some constitutional provision." (citation omitted)); *Clarke v. S.C. Pub. Serv. Auth.*, 177 S.C. 427, 439, 181 S.E. 481, 485 (1935) ("It is the theory and intent of the Constitution of South Carolina that the powers vested in the General Assembly include all powers not specifically reserved by the Constitution." (citations omitted)); *Heslep v. State Highway Dep't of S.C.*, 171 S.C. 186, 193, 171 S.E. 913, 915 (1933) ("It has always been, and is now, the law that the General Assembly may enact any act it desires to pass, if such legislation is not expressly prohibited by the Constitution of this state, or the Constitution of the United States."); *Fripp v. Coburn*, 101 S.C. 312, 317, 85 S.E. 774, 775 (1915) ("The Constitution of the State is a restraint of power, and the legislature may enact any law not prohibited by the Constitution.").

The 1885 Act soon became a point of contention in a case before the Supreme Court of the United States—*Manigault v. Springs*, 199 U.S. 473, 26 S. Ct. 127, 50 L. Ed. 274 (1905). In 1898, several landowners near the intersection of the North Santee River and Kinloch Creek in Georgetown County agreed to remove a dam across the creek. 199 U.S. at 474, 26 S. Ct. at 128, 50 L. Ed. at 275. "This removal was effected and matters allowed to remain as they were until 1903, when the general assembly . . . passed an act . . . [allowing] the defendants by name to erect and maintain a dam across Kinloch creek . . . ." 199 U.S. at 474, 26 S. Ct. at 128, 50 L. Ed. at 276. In passing the 1903 Act, however, the General Assembly failed to comply with the 1885 requirement of a petition filed by the persons who wanted to erect and maintain the dam. Addressing this failure as one of the grounds on which the validity of the 1903 Act was challenged, the Supreme Court stated,

> It is also urged that the act was passed without the formality required by the Revised Statutes of South Carolina of 1893, in which it is declared that no bill for the granting of any privilege or immunity, or for any other private purpose whatsoever, shall be introduced or entertained in either house of the general assembly except by petition, to be signed by the persons desiring such privileges.

199 U.S. at 486-87, 26 S. Ct. at 133, 50 L. Ed. at 281.

The Supreme Court summarily rejected the argument that the 1885 General Assembly could restrict the plenary power of the 1903 General Assembly. The Court stated, "As this is not a constitutional provision, but a general law enacted by the legislature, it may be repealed, amended, or disregarded by the legislature which enacted it." 199 U.S. at 487, 26 S. Ct. at 133, 50 L. Ed. at 281; *see also id.* (stating the 1885 requirement "is not binding upon any subsequent legislature, nor does a noncompliance with it impair or nullify the provisions of an act passed without the requirement").[16]

---

[16] *See also United States v. Winstar Corp.*, 518 U.S. 839, 873, 116 S. Ct. 2432, 2454, 135 L. Ed. 2d 964, 990 (1996) (adhering to *Manigault*); 82 C.J.S. *Statutes* § 11 (2009) ("Implicit in the plenary power of each legislature is the principle that one legislature cannot enact a statute that prevents a future legislature from exercising its lawmaking power."); 82 C.J.S. *Statutes* § 289 (2009) ("One legislature cannot bind another as to the mode in which it will exercise its constitutional power of amendment or limit the general power of a subsequent legislature in the matter of

For these reasons, we hold the supermajority requirement is unconstitutional. The principle we set forth in *School District of Fairfield County* that "absent a constitutional provision to the contrary, the legislature acts and conducts business through majority vote" may not have been binding here because the specific issue in that case was different, *see supra* note 14, but we now hold the principle is the law that governs this case. Unless the constitution provides otherwise, the General Assembly shall legislate by a majority vote.[17] We hold subsection 10-1-165(B) is unconstitutional.

## IV. Severability

We now turn to whether the unconstitutional supermajority voting requirement in subsection 10-1-165(B) requires a finding that the remainder of section 10-1-165—or the entire Heritage Act—must be stricken. "Where a part of a statute is constitutional and a part unconstitutional, the former may be sustained in proper cases while the latter falls." *Gillespie v. Blackwell*, 164 S.C. 115, 122, 161 S.E. 869, 872 (1931). When determining whether a statutory provision can be severed, we consider "whether the constitutional portion of the statute remains complete in itself, wholly independent of that which is rejected, and is of such a character that it may

---

amendments . . . ."); *LeRoux v. Sec'y of State*, 640 N.W.2d 849, 861 (Mich. 2002) ("It is a fundamental principle that one Legislature cannot bind a future Legislature or limit its power to amend or repeal statutes."); John C. Roberts & Erwin Chemerinsky, *Entrenchment of Ordinary Legislation: A Reply to Professors Posner and Vermeule*, 91 Cal. L. Rev. 1773, 1776 (2003) (stating that binding future legislatures, also known as entrenchment, "is 'inconsistent with the democratic principle that present majorities rule themselves.' If a legislature wishes to bind future legislatures, it must invoke the constitutional amendment process"); Charles L. Black Jr., *Amending the Constitution: A Letter to a Congressman*, 82 Yale L. J. 189, 191 (1972) (noting that binding a future legislature is "a thing which, on the most familiar and fundamental principles, so obvious as rarely to be stated, no Congress for the time being can do").

[17] The Respondents argue the supermajority requirement is a permissible procedural rule authorized by article III, section 12 of the Constitution. S.C. Const. art. III, § 12 ("Each house shall . . . determine its rules of procedure."). We disagree. Once legislation is enacted, whether the General Assembly may amend or repeal the legislation is not a matter governed by the procedural rules of either chamber.

fairly be presumed the legislature would have passed it independent of that which conflicts with the constitution." *Joytime Distribs. & Amusement Co. v. State*, 338 S.C. 634, 648-49, 528 S.E.2d 647, 654 (1999) (citing *Thomas v. Cooper River Park*, 322 S.C. 32, 34, 471 S.E.2d 170, 171 (1996); *Thayer v. S.C. Tax Comm'n*, 307 S.C. 6, 13, 413 S.E.2d 810, 815 (1992)).

In *Joytime*, we held the unconstitutional portion of the act could be severed from the constitutional portions because the latter was "capable of being executed independently" of the former. 338 S.C. at 650, 528 S.E.2d at 655. The same is true here. The subsection 10-1-165(A) prohibition on relocating, removing, renaming, or rededicating monuments, memorials, streets, bridges, parks, or other structures operates entirely independent of the manner by which the prohibition may be amended or repealed.

We also found in *Joytime* "the severability clause in [the] Act . . . is strongly worded and evidences strong legislative intent that the several parts of [the] Act . . . be treated independently." 338 S.C. at 649, 528 S.E.2d at 654-55. The "Severability Clause" set forth in Section 4 of the Heritage Act is functionally identical to the clause we found important in *Joytime*, the clause here stating, "the General Assembly hereby declaring that it would have passed this act, and each and every . . . subsection, . . . irrespective of the fact that any one or more other . . . subsections . . . may be declared to be unconstitutional." 2000 S.C. Acts at 2072.

The Petitioners argue, however, the supermajority requirement was nevertheless essential to passage of the Heritage Act, relying on the history of negotiations we described above and Respondent Peeler's contention in his brief, "The supermajority voting requirement was a key component of the Heritage Act . . . ." As we will explain in Section V.A., we have no doubt that section 10-1-165 in its entirety was an essential part of the compromise of the Heritage Act. We also have no doubt—*see Manigault*, 199 U.S. at 487, 26 S. Ct. at 133, 50 L. Ed. at 281; authorities discussed *supra* note 16[18]—that members of the General Assembly and its legal

---

[18] *See also* S.C. Atty. Gen. Op. No. [unnumbered] (June 25, 2020) (stating "one legislature cannot bind another by statute (only by a constitutional provision is a legislature bound)" and "should the General Assembly decide to vote to amend or alter a protected monument, or even the [Heritage] Act itself, it may constitutionally do so by majority vote of each house"). This unnumbered opinion may be found at https://www.scag.gov/wp-content/uploads/2020/06/BurnsM-OS-10492-FINAL-Opin-6-25-2020-02311893xD2C78-02311975xD2C78.pdf (last visited Aug. 26, 2021).

counsel recognized the risk this Court would hold the procedural supermajority requirement invalid upon a proper challenge. Recognizing this risk, the General Assembly included a clear and effective severability clause. Thus, it is apparent to this Court that while the entirety of section 10-1-165 was essential to reach the compromise necessary to achieve the primary purpose of the Heritage Act—removal of the Confederate flag from the dome of the State House—the General Assembly intended that if the supermajority requirement were found invalid, then the rest of the Act—including Section 1 which removed the flag from the dome—would stand.

## V.     State's Power to Prohibit Renaming

We now consider the constitutional challenges to the substantive provisions of subsection 10-1-165(A). We begin—again—with the fundamental principal that the General Assembly has plenary power to legislate unless that power is limited by the constitution. *Ashmore*, 211 S.C. at 96, 44 S.E.2d at 97. The Petitioners make two arguments the General Assembly's power to enact subsection 10-1-165(A) was limited by the constitution, and thus, the subsection is unenforceable. We hold the General Assembly's power to enact subsection 10-1-165(A) was not restricted by the constitution.

### A.     Special Laws

Article III, section 34 of the South Carolina Constitution prohibits the General Assembly from enacting "local or special laws concerning" certain subjects. The Petitioners argue subsection 10-1-165(A) is unconstitutional because it is a special law violating article III, subsections 34(I) and (IX). We disagree.

Article III, subsection 34(I) prohibits special laws that "change the names of persons or places." We find no violation of the constitutional provision, as subsection 10-1-165(A) has precisely the opposite effect. The subsection *prohibits* the changing of names of places, except when the General Assembly enacts legislation to do so. In its immediate impact, therefore, subsection 10-1-165(A) does not implicate article III, subsection 34(I).

The Petitioners then argue that whenever the General Assembly might in the future enact legislation to change the name of a place protected by subsection 10-1-165(A), such an enactment will necessarily be a special law in violation of article III, subsection 34(I). Because of this necessity, the Petitioners argue, subsection 10-1-

165(A) violates the constitution because it is special legislation "in function."  We find it unnecessary to consider this argument because the analysis and resolution of the argument depend on circumstances that have not yet occurred and legislation that has not yet been enacted.[19]

The more difficult question is whether subsection 10-1-165(A) violates article III, subsection 34(IX) of the constitution, which provides, "In all other cases, where a general law can be made applicable, no special law shall be enacted . . . ."  Our first inquiry in this analysis is to determine whether subsection 10-1-165(A) is "general" or "special."  "A law is general when it applies uniformly to all . . . things within a proper class, and special when it applies to only one or more . . . things belonging to that same class." *Kizer v. Clark*, 360 S.C. 86, 92, 600 S.E.2d 529, 532 (2004) (citing *McKiever v. City of Sumter*, 137 S.C. 266, 281, 135 S.E. 60, 64 (1926)).  Under article III, subsection 34(IX), "a law cannot be unconstitutional special legislation unless it is first, indeed, special." *Cabiness v. Town of James Island*, 393 S.C. 176, 191, 712 S.E.2d 416, 424 (2011).  Thus, we must first consider what classifications are created by subsection 10-1-165(A), and whether those classifications apply uniformly to all items within a proper class.

### i.    Classifications

Subsection 10-1-165(A) creates two classifications.  The first classification includes "Revolutionary War, War of 1812, Mexican War, War Between the States, Spanish-American War, World War I, World War II, Korean War, Vietnam War, Persian Gulf War, Native American, or African-American History monuments or memorials erected on public property . . . ."  As counsel for the Petitioners put it during oral argument to this Court, the classification is "some but not all military engagements and some but not all ethnic heritages."  The subsection protects any monument or memorial to one of the ten military conflicts or one of the two ethnic heritages from

---

[19] At oral argument, the Petitioners cited three enactments they contend support their article III, subsection 34(I) special legislation "in function" argument.  In none of these instances, however, did the General Assembly change the name of anything. *See* Act No. 120, 2013 S.C. Acts 1679 (Joint Resolution permitting "the City of North Augusta . . . to move the World War I and World War II Memorial Monument"); Act No. 210, 2005 S.C. Acts 1964, 1964-65 (Joint Resolution providing "the City of Spartanburg may move the statue of Revolutionary War General Daniel Morgan"); Act No. 395, 2004 S.C. Acts 3170 (same).  If these enactments implicate any "special laws" concerns, then those concerns arise only under article III, subsection 34(IX), not article III, subsection 34(I).

relocation, removal, disturbance, or alteration. The statute does not protect monuments or memorials to other wars or other ethnic heritages. The second classification includes any "street, bridge, structure, park, preserve, reserve, or other public area . . . dedicated in memory of or named for any historic figure or historic event . . . ." This classification is broader—almost all-encompassing—but still may not include all physical things that might be named for a historic figure or event.

Because these two classifications do not apply uniformly to all wars, ethnic heritages, or named things, we find subsection 10-1-165(A) is special legislation.

### ii.    Reasonableness

"Article III, § 34(IX), however, does not prohibit all special legislation." *Horry Cnty. v. Horry Cnty. Higher Educ. Comm'n*, 306 S.C. 416, 419, 412 S.E.2d 421, 423 (1991). As we have explained in many cases, a classification is unconstitutional only if there was not a reasonable basis on which the General Assembly chose to make the legislation applicable to some—but not all—things in the particular class. *Cabiness*, 393 S.C. at 189, 712 S.E.2d at 423; *Kizer*, 360 S.C. at 92, 600 S.E.2d at 532. As we stated in *Horry County*, repeating our explanation of the point from *Shillito v. City of Spartanburg*, 214 S.C. 11, 20, 51 S.E.2d 95, 98 (1948),

> The language of the Constitution which prohibits a special law where a general law can be made applicable, plainly implies that there are or may be cases where a special Act will best meet the exigencies of a particular case, and in no wise be promotive of those evils which result from a general and indiscriminate resort to local and special legislation. There must, however, be a substantial distinction having reference to the subject matter of the proposed legislation, between the objects or places embraced in such legislation and the objects and places excluded. The marks of distinction upon which the classification is founded must be such, in the nature of things, as will in some reasonable degree, at least, account for or justify the restriction of the legislation.

*Horry Cnty.*, 306 S.C. at 419, 412 S.E.2d at 423 (quoting *Duke Power Co. v. S.C. Pub. Serv. Comm'n*, 284 S.C. 81, 90, 326 S.E.2d 395, 400-01 (1985)). Therefore—considering "the exigencies of a particular case"—when a classification created by a statute is a reasonable and rational way to further the goal of the statute, it is not

unconstitutional special legislation. *See Elliott v. Sligh*, 233 S.C. 161, 166, 103 S.E.2d 923, 926 (1958) ("The basis of classification must have some reasonable relation to the purposes and objects to be attained by the legislation.").

As we have explained in this case, removal of the Confederate flag from the dome of the State House was one of the most important—and difficult—political achievements in this State's history. The tone of the debate late in the 2000 Legislative Session was heated. The history recited above supports the arguments of Respondent Peeler and Respondent Lucas that the Heritage Act was a hard-fought compromise reached in that hostile atmosphere. At one point Senator John Land— Senate Majority Leader and a proponent of the 1994 compromise proposal—became so frustrated he "threatened to introduce legislation that would simply strike the flag from the dome (without moving it anywhere), if lawmakers failed to find a compromise soon." Prince, *supra*, at 217. As Senator McConnell—a cautious proponent of the 1994 compromise proposal, later a primary opponent to Governor Beasley's proposal,[20] finally a proponent of the 2000 compromise—stated on the floor of the Senate the day the Senate approved the Heritage Act on second reading, the compromise signified an "opportunity to bring this state together and to close this issue and to hope that we build on it for our future and not let it be something that divides us further."[21]

After decades of controversy, members who opposed removing the flag from the dome of the Capitol became willing to compromise if given the assurance that doing so would not "open the floodgates," and if the renaming and removal of other historic items could be prevented. Thus, the "pro-flag" legislators agreed to remove the Confederate flag from the State House dome, but in anticipation of further efforts to rename or remove other memorials, agreed to do so only if those memorials would be protected. After Senator McConnell's speech on April 12, Senator Ravenel asked him to "touch on the significance and the value of the protection of all the monuments in the State and the place names." Senator McConnell explained,

> Senator, that's the other thing - that it is significant on both
> sides, and I hope it's going to be the launching pad for
> protecting a lot of those sites - not just by law but this

---

[20] *See Debating the flag: 3 views*, *supra* note 10 (publishing remarks by Senator McConnell).

[21] S. Journal, 113th Leg. Sess. at 2220 (S.C. Apr. 12, 2000).

legislature actively trying to get involved in protecting those sites before they are lost. . . . It is a solid bond that we have put in that bill which says that these things will be left alone, and what it offers us is the opportunity not to get involved with what other people have done and to quibble over plaques and other things, but let our history be our history, and let's hopefully shape our future based upon where we think our people should go.

S. Journal, 113th Leg. Sess. at 2220 (S.C. Apr. 12, 2000).

On the other side, the "anti-flag" legislators agreed to Section 3—to protect the monuments and memorials from renaming or removal—but only in exchange for removal of the flag from the dome of the Capitol. As many remarked during the debate, "few people on either side of the matter got what they wanted."[22] The inclusion of the Section 3, subsection 10-1-165(A), restrictions on future renaming and removal was essential—and reasonable—to achieve the compromise and the primary purpose of the Heritage Act.

Finding the compromise reasonable, we also find a rational and reasonable basis for differentiating between those wars, ethnic heritages, and named things that subsection 10-1-165(A) protects and those it does not protect. The wars included are the principal wars in which South Carolinians participated on behalf of the United States as of the year 2000. The things included for protection against renaming—streets, bridges, structures, parks, preserves, reserves, or other public areas—are so nearly complete as to treat all similarly within the class. The things not included for protection—removal of structures such as statues that are not monuments or memorials to the listed wars—are narrow and clearly ascertainable. We find it hard to imagine how the General Assembly could have better defined this classification.

Most importantly, however, the African American and Native American heritages included for the protection of monuments and memorials are those heritages whose descendants have suffered most from discrimination and other mistreatment at the hands of the State, its businesses, and its citizens. The Heritage Act removed the symbol—for many—of white supremacy from the place of sovereignty on the dome of the Capitol; a place so offensive to so many. But the Act's failure to remove the

---

[22] Joyner, *supra* note 10.

flag from the Capitol grounds entirely left an offensive sting to the African Americans and Native Americans whose ancestors suffered at the hands of those who oppressed them. The final compromise affected everyone, but it affected none more than men and women of African American and Native American heritages. In a compromise centered on the removal of what many view as a symbol of racism, we hold the protection of monuments and memorials dedicated to these two heritages is reasonable.[23]

Regarding article III, section 34 of the constitution, we have stated, "The evil sought to be remedied was the great and growing evil of special and local legislation. To remedy this evil, such legislation was *absolutely* prohibited as to certain enumerated subjects, and *conditionally* prohibited as to all other subjects." *Thomas v. Macklen*, 186 S.C. 290, 297, 195 S.E. 539, 542 (1938). We do not believe subsection 10-1-165(A) is the type of legislation the article III, section 34 prohibition on special laws was designed to remedy. The General Assembly believed inclusion of the subsection 10-1-165(A) restrictions on renaming and removal of some but not all historic items was necessary to achieve the primary goal at hand. "We will not overrule the legislature's judgment that a special law is necessary unless there has been a clear and palpable abuse of legislative discretion." *Kizer*, 360 S.C. at 93, 600 S.E.2d at 533.

As individual citizens—even Justices—we might look back on these events and wish the negotiations had been handled differently. The reality, however, is the Heritage Act brought the Confederate flag down from atop the seat of South Carolina sovereignty. It is simply beyond the proper authority of this Court to say that the subsection 10-1-165(A) restrictions were not reasonable under the circumstances the General Assembly faced in the heat of those critical negotiations.

---

[23] It is not our intent in any manner to disparage those members of the General Assembly who were initially—or ultimately—in support of maintaining the flag atop the Capitol dome. Good and decent men and women advocated on both sides of this difficult issue. It is precisely because of the quality and character of our legislators that the principled grand compromise was reached. While the extensive and uncomfortable history may initially appear irrelevant to the legal issues presented in this case, that history is directly germane to our analysis leading to what we are firmly persuaded is the inescapable conclusion—there is a manifestly reasonable basis for including subsection 10-1-165(A) in the Heritage Act.

Subsection 10-1-165(A) is not unconstitutional special legislation under article III, section 34 of our constitution.

## B. Home Rule

Before 1973, legislators governed their home counties through acts of the General Assembly. *Duncan v. York Cnty.*, 267 S.C. 327, 333-34, 228 S.E.2d 92, 95 (1976). In 1972 and 1973, the Legislature and the voters amended the South Carolina Constitution to include the concept of "Home Rule," leaving the local governments to govern themselves. Act No. 1631, 1972 S.C. Acts 3184, 3185; Act No. 63, 1973 S.C. Acts 67, 68-69. Home Rule is set forth in article VIII, section 7 of the Constitution[24] and provides,

> The General Assembly shall provide by general law for the structure, organization, powers, duties, functions, and the responsibilities of counties . . . . No laws for a specific county shall be enacted and no county shall be exempted from the general laws or laws applicable to the selected alternative form of government.

These constitutional provisions required the General Assembly to implement Home Rule but "left it up to the General Assembly to decide what powers local governments should have." *Hosp. Ass'n of S.C., Inc. v. Cnty. of Charleston*, 320 S.C. 219, 225-26, 464 S.E.2d 113, 117 (1995). To comply with this requirement, the General Assembly enacted section 4-9-25 of the South Carolina Code (2021),[25] which provides,

> All counties of the State, in addition to the powers conferred to their specific form of government, have authority to enact regulations, resolutions, and ordinances, not inconsistent with the Constitution and general law of this State, including the exercise of these powers in relation to health and order in counties or respecting any

---

[24] *See also* S.C. Const. art. VIII, § 9 (providing a similar mandate in relation to municipalities).

[25] *See also* S.C. Code Ann. § 5-7-30 (Supp. 2020) (conferring similar authority to municipalities).

subject as appears to them necessary and proper for the security, general welfare, and convenience of counties or for preserving health, peace, order, and good government in them. The powers of a county must be liberally construed in favor of the county and the specific mention of particular powers may not be construed as limiting in any manner the general powers of counties.

Thus, Home Rule—in the context that applies here—prohibits the General Assembly from passing "laws for a specific county." *Knight v. Salisbury*, 262 S.C. 565, 573, 206 S.E.2d 875, 878 (1974). However, the General Assembly may still pass general laws "specifically limiting the authority of local government." *Town of Hilton Head Island v. Morris*, 324 S.C. 30, 34, 484 S.E.2d 104, 106 (1997); *see also id.* ("The authority of a local government is subject to the general laws passed by the General Assembly.").

The Petitioners argue subsection 10-1-165(A) conflicts with Home Rule because it prevents local governments from acting on requests of the public for the change, removal, or relocation of controversial historic monuments or memorials. They contend local governments are in a better position to act with regard to this subject because "they can be more responsive" to the thoughts of the community. This may be true, but Home Rule is not about who holds the better wisdom. Home Rule does not allow local governments to ignore legislatively enacted state law because they are in a more suitable position to address an issue. Subsection 10-1-165(A) does not apply to a specific county or geographic area and, thus, it is a general law with respect to territorial classifications. Further, as we analyzed above, the statute is not an unconstitutional special law in any other respect. Importantly, "the subject matter of the legislation is not peculiar to [any] political subdivision." *Kleckley v. Pulliam*, 265 S.C. 177, 187, 217 S.E.2d 217, 222 (1975). Therefore, we hold subsection 10-1-165(A) does not violate Home Rule and all counties must comply with it because "no county shall be exempted from the general laws." S.C. Const. art. VIII, § 7.

## VI. Conclusion

The substantive provisions of subsection 10-1-165(A) were not an unconstitutional overreach by our General Assembly. Rather, those provisions were part of the grand compromise of the Heritage Act. This compromise accomplished one of the greatest achievements in the political history of South Carolina—the removal of the Confederate flag from the dome of our Capitol, the seat of government for all our people. To accomplish this achievement, the General Assembly deemed it necessary

to include the provisions of subsection 10-1-165(A).  Under the circumstances we have explained in this opinion, it would be beyond the proper authority of this Court to now hold the inclusion of those substantive provisions was not reasonable.

However, the supermajority requirement of subsection 10-1-165(B) *was* an unconstitutional overreach by our General Assembly.  The 113th General Assembly—like all legislatures—had no authority to restrict the power of future legislatures to act by majority vote.  We sever the unconstitutional requirement of a supermajority vote to amend or repeal section 10-1-165 from the remainder of the Heritage Act.

**DECLARATORY JUDGMENT ISSUED.**

**BEATTY, C.J., KITTREDGE, HEARN and JAMES, JJ., concur.**